*1426 OPINION
By the Court,
Young, J.:
Appellant Avram Nika (“Nika”) left Aptos, California, where he lived with his wife Rodika, between noon and 1 p.m. on August 26, 1994, and was traveling to Chicago so that he could fly from there to Romania to visit his sick mother. Nika’s car was full of clothes, tools, electronic items, and a small television. According to Rodika, Nika was from Romania and spoke fluent Serbo-Croatian, spoke almost fluent Romanian, and spoke only broken English. Rodika also stated that Nika did not speak colloquial English and that she had to be present when he had dealings with merchants, government officials, and other people. Nika was driving a brown Chrysler New Yorker, and testimony indicated that it takes approximately five and one-half hours to drive from Aptos to Reno. Nika’s car broke down at mile marker 34, approximately twenty miles east of Reno.
Edward Smith (“Smith”) was employed as a manager at a Burger King in Reno. Smith left work to go home at approximately 8 p.m. to 8:10 p.m. on August 26, 1994. The Smith family lived in Fallon, and Smith had made plans with his wife and child to attend a movie that started at approximately 9:45 p.m. Smith drove a silver 1983 BMW, and Mrs. Smith testified that the BMW often would not start, that they had to push start it, and that they had recently bought a new battery for the BMW in July 1994. Testimony indicated that it takes approximately one hour to one hour and fifteen minutes to get from the Burger King in Reno to the Smith’s home in Fallon and that it takes approximately forty to forty-five minutes to get from the Burger King to mile marker 34.
Several people saw Nika standing by his car at mile marker 34 on August 26, 1994.[1] Edward Sanchez was driving a maroon *1427 Nissan Sentra and was flagged down by Nika at approximately 7:45 p.m. Sanchez pulled his car in front of Nika’s and backed up toward the brown Chrysler. Nika approached Sanchez’s passenger window and said his car had broken down and that he needed help. Sanchez got out of his car and attempted to find out what was wrong with Nika’s car. Sanchez stated that Nika had a thick accent, strong body odor, a day’s beard growth and wore blue cut-off jeans. Sanchez offered to give Nika a ride, but Nika could not decide if he wanted to accept the ride and instead had Sanchez call a tow truck for him. Sanchez stated it was shortly after 8 p.m. when he got back into his car, perhaps 8:02 p.m. Sanchez stopped at a truck stop in Fernley and asked one of the clerks to call a tow truck for Nika.
Davina Boling was driving with her boyfriend on 1-80 and saw the brown Chrysler on the side of the road around 8:30 p.m. They pulled over to help Nika, whom Boling described as looking frustrated, and Nika told them he had been there for three or four hours and needed a tow truck. They offered him a ride, which he declined, but he requested that they call a tow truck for him. As they left, Nika told them “Good-bye. Thank you, God bless.”
Debra Fauvell (“Debra”) stated that at approximately 8:40 p.m. she and her husband passed mile marker 34. She stated that she saw two cars on the side of the road, the first was a tan or light colored, four-door sedan which did not have any lights on and which had both driver’s side doors open. About 150 feet in front (east) of the tan car she saw a dark brown sedan-type car with its hazard lights on. She saw two people standing by the first (most westerly) car. The person standing by the rear passenger side of the first car had a medium build, was about five feet ten inches tall, and was wearing a white T-shirt and light colored, faded jean-type pants. The second person was twenty feet in front of the first person, was bigger and had bushier hair than the first person, and was walking in a southeasterly direction away from the cars. Debra was shown a picture of Smith and stated that the *1428 second man’s stature was consistent with Smith’s. Daniel Fauvell, Debra’s husband, testified that he was driving the car. He stated that he was focused on driving and did not see much, but the first car that they passed did not have any lights on, the second car had its hazard lights on, and one person was standing next to the first car.
Trooper Terry Whitehead of the Nevada Highway Patrol testified as follows. He came into contact with Nika while patrolling the highway on August 26, 1994. Whitehead was traveling westbound on 1-80 when he saw a stranded BMW on the eastbound shoulder with its hazard lights on. He made a U-turn across the highway and went to help the stranded motorist. As Whitehead approached the BMW, he passed a brown Chrysler with no lights on. Because the Chrysler had no lights on, the hood was not open, and nobody was in the car, he drove further and pulled behind the BMW. The dispatch log indicates that he ran a license plate check on the BMW at 8:51 p.m. (the license plate was a Nevada plate), and he also looked at the BMW to see if it had indications that it was stolen. There were no people or items of personal property in the BMW. Because the dispatcher did not return his inquiry, he assumed that the BMW was not stolen and started to back up to check out the Chrysler, which was about 400 feet behind (west of) the BMW. As Whitehead backed up, he saw someone waving a flashlight from a southeasterly direction apparently trying to get his attention. The flashlight was coming from the area where Smith’s dead body was found the next day. Whitehead got out of his car and asked Nika what was wrong with his car; Nika pointed to the BMW and stated, “Everything’s wrong with it.” Whitehead asked Nika if he needed a ride. Nika declined and instead asked for a tow truck. Whitehead said he would call one and asked Nika if there was anything else he could do for him. Nika stated he could use a ride to Chicago. Whitehead stated he did not patrol that far. At 8:53 p.m. Whitehead requested a tow truck for Nika. Whitehead stated that Nika was wearing white high-top tennis shoes and did not seem more nervous than any other person who had been stranded at night on the side of the road. He also stated that he did not see any blood on Nika’s shoes or fanny pack and that he never asked Nika his name. Whitehead left the scene at 8:56 p.m. to answer a call for back-up assistance on a DUI case.
Karl Younger testified for the defense. He stated that he worked for Anderson Towing and received a call at his home in Reno on August 26, 1994, at 8:45 p.m. requesting tow truck assistance at mile marker 34 for a Chrysler New Yorker.[2] At approximately *1429 9:15 p.m., Younger saw the Chrysler and backed up toward it to prepare to tow it, at which time he noticed two other cars about sixty yards in front of (east) the tow truck. The first car in front of Younger was a silver BMW with out-of-state license plates and its lights on. The second car, a blue or brown Nissan or Datsun which also had its lights on, was in front of the first car. As he backed up to the Chrysler, two people approached the tow truck and told him that the Chrysler needed oil, that they had taken the driver to town to get the oil, and that the tow truck was no longer needed. Neither of these two men spoke with a thick accent and both spoke perfect English. Younger also noticed five to seven other people with flashlights in the area where Smith’s body was eventually found. Younger then left the scene.
Loni Kowalski testified that she worked at Hanneman’s Tow Service and received a call at 8:53 p.m. from the Highway Patrol requesting a tow truck for a silver BMW. At 8:57 p.m. she called Jerry Turley, an employee who was on call but at his own home, to tell him to respond to the request. Turley testified that he drove west from Fernley toward mile marker 34, looking on both sides of the highway for the silver BMW. He did not see the BMW and called Kowalski to inform her of such. Kowalski told Turley to keep looking, and Turley eventually saw two cars on the eastbound shoulder, exited the freeway and re-entered going eastbound, and put his flashers on as he arrived at the two cars. He noticed that neither car was a silver BMW, turned his flashers off, and called Kowalski at 9:49 p.m. to tell her that he could not find the BMW. Turley stated that one car was a large dark car that could have been a Chrysler and that the other car was a smaller domestic car, like a Mercury Monarch or Ford Granada, which had its flashers on. He saw two people standing by the Chrysler but could not describe them.
On August 27, 1994, Ray Hansen, a brakeman for Southern Pacific Railroad, noticed what he thought was a body lying next to the fence between the railroad tracks and 1-80. The police were called, and a trooper found the body. Careflight was also called because it was first believed that a motorcycle accident had occurred and that medical attention was required. The Careflight helicopter landed approximately fifteen to fifty feet from the body, and the medics checked the body and discovered that the person was dead.
David Billau was the crime scene investigator. He stated that the Careflight helicopter which landed near the crime scene could have disturbed the crime scene. He described the crime scene as follows: the Chrysler was parked off the shoulder of the eastbound lane of 1-80; south of the car was a small hillside; south of the hillside was a barbed wire fence under which Smith’s body *1430 was dumped; and south of the fence and body were the railroad tracks. Drag marks in the dirt extended from the Chrysler to where the body was found. By the Chrysler’s rear passenger tire was a rock with pooled blood on it. By the front tire was an area of red stained dirt in which a bullet and human hair were found. A spent shell casing was found a few feet in front of the red stained dirt. Smith’s body was found under the barbed wire fence and his pants were hanging from the fence. His wallet was found with money still in it lying next to his body. Smith had been shot in the forehead.
The police traced the brown Chrysler to Avram Nika and an address in Chicago. On August 29, 1994, the Washoe County Sheriff’s office called the Chicago police for assistance in locating Nika. Chicago Police Detective Tony Villardita and his partner discovered several addresses for Nika and attempted to locate him. They saw Nika exit a silver BMW, and when they asked him his name, Nika gave them a false name. Based on this information they arrested Nika for possession of a stolen vehicle and read him his Miranda rights. Nika apparently told the police that he understood his rights and that he would waive those rights and speak to them.
Nika first denied any knowledge of the BMW and said that he had walked to his house. When the police told him that they saw him in the car and that they had found the car key in his pocket, Nika said that the car belonged to his friend, but that he did not know his friend’s name. The police then told Nika that the BMW was involved in a murder outside Reno. Nika said that he had left Aptos in his Chrysler, arrived in Reno at around 2 p.m., went to a casino to eat, and when he came out of the casino his car was gone but his license plates were still there. At that point three males pulled up and offered to sell the BMW to him for $300.00. He took the offer, put his plates on the car, and drove to Chicago. He also stated that he made no other stops in Reno and that the car had no mechanical problems.
The police then told Nika that the BMW was seen on the side of 1-80, and Nika then said that the BMW had an oil and antifreeze problem about thirty miles east of Reno, several people stopped to help him, and he eventually got the car restarted. Nika said that he did not see his stolen Chrysler where the BMW broke down. The police told him that witnesses had seen both cars on the side of the road. Nika then told the police that he was “ready to tell the truth,” and he said that he left the casino in his Chrysler and had car problems about thirty miles east of Reno. He said several people stopped to help him, and then the same three males he described earlier stopped to help him and offered to sell him the BMW for $300.00. He bought the car, changed the license *1431 plates, and loaded his personal property into the BMW. Nika also stated that just as he was ready to leave and while the three males were still at the scene, a police officer stopped to help him. Nika told the officer that the BMW was experiencing problems but that he was able to start it, and then he drove to Chicago. Nika also stated that he went to his mother-in-law’s garage in Chicago to unload his personal property, drove to get something to eat, and then was arrested by Villardita and his partner. After this questioning was conducted, John Yaryan (“Yaryan”), the Washoe County Sheriff’s deputy who had flown to Chicago, questioned Nika. However, the district judge suppressed this statement based on the fact that Nika had invoked his right to remain silent and his right to counsel and that Yaryan continued to question Nika at length. The State has not argued that the suppression was improper.
The police obtained consent to search the garage of Nika’s mother-in-law. They found a fanny pack, tennis shoes, and blue denim cut-off jeans, all of which were tested by forensic investigators. The forensic investigators found blood spatter on all three items, and DNA testing indicated that the blood was consistent with that of Smith and excluded Nika as a source. The forensic investigators stated that at a minimum, 1 in 8,800 people had the same DNA pattern they discovered.
Nika was extradited from Chicago to Reno and was booked into Washoe County jail on September 1, 1994. During Nika’s incarceration, Nathanial Wilson (“Wilson”), an inmate at the Washoe County jail, befriended Nika. Wilson testified to statements made by Nika regarding the events on 1-80. Specifically, Nika told Wilson that his car had broken down, a man stopped to help him, the man called him a “motherf-,” he hit the man in the head with a crowbar, and then shot him in the head. Nika stated that in Romania, his country of origin, you did not use the word “motherf-,” and that you could be killed for calling somebody that name. Nika stated that the victim was lying on the ground when he was shot in the head, that he tried to hide the body in some bushes, and that he killed the man because “he needed to get to Chicago.” Nika stated that he hid the gun, which was an automatic pistol, about five miles from the crime scene. (The gun was never found despite an extensive search.) Nika told him that he had taken the battery out of his car and put it in the BMW because the BMW would not start.[3]
Wilson was in jail on one count of selling cocaine and stated *1432 that he did not receive any deal from the prosecution in exchange for his testimony. However, Wilson spoke to the police for the first time on October 11, 1994, and was released from jail and granted probation on November 18, 1994, after pleading guilty to what he called “possession for sale,” a lesser crime than that with which he was originally charged.
Dr. Anton Sohn (“Dr. Sohn”) conducted the autopsy on Smith. He found three blunt trauma wounds on the back of Smith’s head where Smith had been hit with an object heavy enough and with enough force to fracture the skull beneath each wound. Dr. Sohn testified that at least one of the blunt trauma wounds was delivered to the skull while Smith was lying on the ground face down. On Smith’s forehead was a bullet wound which Dr. Sohn classified as a “contact wound,” stating that it was created when the muzzle of the gun was placed directly against the forehead and the gun was fired. Dr. Sohn found an exit wound in the back of Smith’s head and found other lacerations on Smith’s face. Dr. Sohn found scrapes or “drag marks” on Smith’s chest which were consistent with Smith’s body being dragged in the dirt. Dr. Sohn stated that the gunshot to the head was the cause of death and that the blunt force traumas were inflicted before Smith was shot.
At the conclusion of the trial, the jury found Nika guilty of first degree murder with the use of a deadly weapon. At the penalty hearing, the prosecution sought the death penalty and alleged three aggravating circumstances as follows:
1. Evidence that the murder was committed by AVRAM NIKA during the commission of or attempt to commit a robbery. NRS 200.033(4).
2. Evidence that the murder was committed to avoid or prevent a lawful arrest. NRS 200.033(5).
3. Evidence that the murder was committed upon one or more persons at random and without apparent motive. NRS 200.033(9).
Anna Boka (“Anna”), Nika’s mother-in-law, testified at the penalty hearing as follows. Nika had a violent temper, and in 1991 when she did not give Nika money for a trip, he threatened to kill both her and Rodika, Anna’s daughter and Nika’s wife. Peter Boka (“Peter”), Anna’s husband, told Anna that in September 1993 he and Nika had gotten into an argument and Nika put a gun to Peter’s head. (Peter later testified that he never saw a gun and that Nika only threatened to shoot him.) Anna stated on cross-examination that Peter was a very heavy drinker and had instigated the fight in September 1993. In October 1993, Nika stated that he would kill Anna if Rodika did not come back to live *1433 with him. Also in October 1993, Nika wanted to see his and Rodika’s baby who was staying at Anna’s house, but Peter refused to allow Nika in the house. At that point Nika flashed a gun and told Anna that if Peter did not let him see the baby, he would kill Peter. Finally, in November 1993, Nika told Anna that if Rodika did not leave Anna’s house in Chicago and come back to him, he would burn down Anna’s house.
Mary Ellen Izzo testified that Nika had raped her in an apartment building in Chicago in December 1989. She stated that he was helping people move into or out of the building, that she met him in the hallway, and that he later told her that his mother, who was the manager of the apartment, wished to see her.[4] She went into the manager’s apartment with Nika and he locked the door and told her to come into the bedroom because that was where his mother was. When she was in the bedroom, Nika pushed her on the bed, hit her, and sexually penetrated her. Izzo escaped after Nika let her up, and she then called the police. Nika was never prosecuted for the alleged crime, and Izzo stated that she did not proceed with the prosecution because Nika’s aunt threatened to evict her if she proceeded, she had three children to take care of, and she did not have enough money to move. Izzo stated on cross-examination that she had bruises on her face and breasts as a result of the rape; however, a hospital report indicated that she had only red marks on her neck. The defense attorney asked Izzo if she was a drug user, and Izzo stated that she was not. Izzo stated that shortly after this event she received government housing and moved.
Rodika, Nika’s wife, testified for the defense as follows. In reference to the alleged sexual assault, Izzo had approached Rodika’s family and stated that if they did not want to see Nika jailed for rape, they had better pay her some “big money.” She had heard that Izzo had a drug problem and had hung her children out of her second story window. In reference to the September 1993 incident between Nika and Peter, the police were called, and they never found a gun. She acknowledged on cross-examination that Nika was violent and had made death threats against her and her family on several occasions.
Dorina Vukadin, Rodika’s sister, also testified for the defense. She stated that Nika played sports with her children and that her. children liked Nika, but she also stated that he was a stern disciplinarian.
On July 10, 1995, the jury found beyond a reasonable doubt that the murder committed by Nika was aggravated by the fact *1434 that the murder was committed upon Smith at random and without apparent motive. The jury also found that no mitigating circumstances existed.[5] Consequently, the mitigating circumstances did not outweigh the aggravating circumstances found; and therefore, a sentence of death was imposed.
Nika now challenges both his conviction and sentence of death in this direct appeal.
1. Sufficiency of the evidence
Nika argues that he was convicted upon suspicion alone and that insufficient evidence existed to support his conviction. The prosecution argues that the evidence proved beyond a reasonable doubt that Nika killed Smith. The standard of review for sufficiency of the evidence upon appeal is whether the jury, acting reasonably, could have been convinced of the defendant’s guilt beyond a reasonable doubt. Kazalyn v. State, 108 Nev. 67, 71, 825 P.2d 578, 581 (1992).
The State’s theory of the case was that Smith left work at approximately 8 p.m. and arrived at mile marker 34 at approximately 8:40 p.m. At approximately 8:40 p.m., the Fauvells saw two men at mile marker 34 by the brown Chrysler, that the BMW had no hazard or dome lights on, even though one of the doors was open, and that the BMW was parked behind (west of) the Chrysler. At approximately 8:51 p.m., Nevada Highway Patrol Trooper Terry Whitehead arrived at the scene, did not see Smith, noticed that the BMW had its hazard lights on and the brown Chrysler did not have any lights on, and the BMW was parked in front of (east of) the Chrysler. Whitehead also noticed that Nika was walking toward him from the direction of where the body was found. Nika told Whitehead that his car, the BMW, was experiencing trouble and that he needed a tow. The State’s theory was that when Whitehead arrived at the scene at 8:51 p.m., Nika had already killed Smith, dragged his body to the fence, and *1435 transferred the battery from the Chrysler to the BMW so that he could drive the BMW to Chicago. Wilson’s testimony supported this theory because he testified that Nika told him he had killed Smith after Smith called him a “motherf-,” and that after he killed Smith and hid his body, he took the battery out of the Chrysler and put it into the BMW. The BMW was found in Chicago with a different brand of battery than the Smiths had put into the car. Additionally, the car was found in Illinois with Illinois license plates on it.
Other evidence which supports the State’s theory is that when Nika was arrested in Chicago, he told the police five or six different versions of the events that occurred on 1-80. Also, blood spatter consistent with Smith’s blood was found on the top of Nika’s shoes, the inner thigh portion of his pants, and on his fanny pack. This evidence, along with the angled path of the bullet through Smith’s skull, supports the State’s theory that Nika stood over Smith, who was then face up, pressed the gun up to Smith’s forehead, and pulled the trigger. Furthermore, Wilson testified that Nika confessed to hitting Smith in the head with a crowbar and shooting him in the head, and Dr. Sohn confirmed that Smith’s body was in that condition when it was discovered. Finally, Colleen Villa, a Washoe County Sheriff working in the intake department at the county jail, testified that Nika told her that he had assaulted a man around 9 p.m. and that the man was dead. We conclude that based on this evidence, a jury, acting reasonably, could have been convinced of Nika’s guilt beyond a reasonable doubt.[6]
2. Constitutionality ofNRS 200.033(9)
A state that wishes to authorize capital punishment has a constitutional responsibility to tailor its law in a manner which avoids the arbitrary and capricious infliction of the death penalty. Godfrey v. Georgia, 446 U.S. 420, 428 (1980). The United States Supreme Court makes clear that a death penalty system will be unconstitutional if it has “ ‘standards so vague that they would fail adequately to channel the sentencing decision patterns of *1436 juries [resulting in] a pattern of arbitrary and capricious sentencing.’ ” Id. at 428 (quoting Gregg v. Georgia, 428 U.S. 153, 195 n.46 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).
Nika contends that NRS 200.033(9) is unconstitutional because it fails to “genuinely narrow the class of persons eligible for the death penalty . . . .” Zant v. Stephens, 462 U.S. 862, 877 (1983). Nika’s claim fails to raise an issue not previously addressed by this court in its numerous other opinions upholding the constitutionality of NRS 200.033(9). See, e.g., Lane v. State, 110 Nev. 1156, 881 P.2d 1358 (1994); Paine v. State, 110 Nev. 609, 877 P.2d 1025 (1994), cert. denied, 514 U.S. 1038 (1995); Bennett v. State, 106 Nev. 135, 787 P.2d 797 (1990); Moran v. State, 103 Nev. 138, 734 P.2d 712 (1987); Ford v. State, 102 Nev. 126, 717 P.2d 27 (1986). Accordingly, we decline to revisit this issue once again.
3. Evidence supporting NRS 200.033(9)
NRS 177.055(2)(b) requires this court to examine the record on appeal when determining whether evidence supports the finding of an aggravating circumstance. Nika contends that the death sentence must be set aside because the evidence did not support the aggravating circumstance enumerated in NRS 200.033(9). The prosecution avers the opposite.
The jury concluded that Smith’s murder was aggravated by the fact that the murder was committed upon Smith “at random and without apparent motive” pursuant to NRS 200.033(9). The jury did not find any mitigating circumstances.
This court previously considered cases where the aggravating circumstance at issue was that stated in NRS 200.033(9). In Bennett v. State, 106 Nev. 135, 787 P.2d 797 (1990), Bennett entered a convenience store, laid a piece of candy on the counter, and shot the clerk in the face as she rang up his purchase, killing her instantly. Bennett then jumped over the counter and attempted to open the cash register. Id. at 137, 787 P.2d at 798. This court concluded that because the killing was not necessary to accomplish the robbery or burglary, the jury’s finding that Bennett killed without an apparent motive was supported by substantial evidence. Id. at 143, 787 P.2d at 802.
In Paine v. State, 107 Nev. 998, 823 P.2d 281 (1991), Paine and an accomplice shot, killed, and robbed one taxi cab driver and then shot and robbed a second taxicab driver who did not die. At his penalty hearing, Paine stated that there was no reason for him to have pulled the trigger in either case. Id. at 1000, 823 P.2d at 282. Paine was sentenced to death after the jury found two aggravating circumstances, one of which was that the killing was *1437 random and without apparent motive. This court reasoned that sufficient evidence existed to conclude that the killing was random and without motive because the robbery could have been completed without killing the victim. Id. at 999-1000, 823 P.2d at 282. This court applied the same reasoning to uphold death sentences in Lane v. State, 110 Nev. 1156, 881 P.2d 1358 (1994), and Moran v. State, 103 Nev. 138, 734 P.2d 712 (1987).
In the instant case, the jury was instructed at the penalty hearing that “[a] murder may be random and without apparent motive if the killing of a person was not necessary to complete a robbery.” Although Nika was not formally charged with the crime of robbery,[7] the jury was provided with an instruction defining robbery. When taken in conjunction, these instructions required the jury to consider whether Nika needed to murder Smith in order to rob him of his automobile and continue on to Chicago. We conclude that the evidence presented at trial provides ample support for the jury’s finding that Nika acted at random and without apparent motive.
Dr. Sohn testified that Smith was struck three times in the back of the head causing blunt-force trauma wounds. While none of the blows was independently capable of causing death, they were sufficiently traumatic to render Smith incapacitated. In fact, Dr. Sohn testified that each blow fractured Smith’s skull. One blow knocked him to the ground, and at least one of the blows was delivered with Smith’s head already face down in the dirt and rocks. The jury could have then reasonably inferred that Nika turned Smith over, face up, and without resistance, placed the gun barrel against Smith’s forehead and administered the fatal gunshot wound. Dr. Sohn’s interpretation of the forensic evidence is corroborated by Wilson. Wilson testified that Nika stated he struck Smith multiple times with a crow bar. These blows knocked Smith to the ground. As Smith lay on the ground, Nika put the gun to Smith’s forehead and fired.
This testimony supports the jury finding that Nika did not need to kill Smith in order to take his car. Smith was struck three times in the back of the head with a crow bar. Each blow fractured his skull. In all likelihood, Smith was either unconscious or semiconscious as he lay on the ground. Therefore, it would be reasonable to conclude that Smith was in no condition to prevent Nika from robbing him of his automobile.[8]
*1438 Further support for the finding that the murder was committed at random and without apparent motive can be found in the fact that Smith’s wallet and money were found next to his body. Thus, robbery was not a likely motive for the killing.
Additionally, Trooper Whitehead apparently came upon Nika after Smith had been killed and his body dragged to the barbed wire fence. Nika pointed to the BMW and acted as if it were his own, but, nevertheless, asked Whitehead for a ride to Chicago. This lends support to the contention that Nika’s motivation to kill Smith was not to take the BMW. Nika was apparently ready to leave the scene in any manner possible, including with a State trooper. Accordingly, the evidence supports the aggravating circumstance embodied in NRS 200.033(9).
4. Custodial interrogation
The dissent finds issue with the district court’s determination that no custodial interrogation of Nika occurred. However, after a thorough review of the record and listening to oral argument from Nika’s counsel, we conclude that the district court did not err in its determination.
On September 1, 1994, after being extradited to Nevada from Illinois, Nika was booked into the Washoe County jail. The following day, Washoe County Deputy Colleen Villa called Nika aside. Villa worked in the county jail’s classification unit and it was her job to place prisoners in an environment where they did not present a danger to themselves or others. To facilitate the placement process, Villa asked every prisoner a series of questions from a pre-printed questionnaire. One of the questions on the form was, “Have you ever assaulted or battered anyone?” When Villa asked Nika this question, he answered that he had fought with a man one evening around 9 p.m. or 9:30 p.m. and that the man was dead. Nika also stated that a gun was placed to a head, but Villa was unsure of who placed the gun to whose head. Nevertheless, Villa did not pursue the answer nor ask for a clarification from Nika. She merely continued down the list of questions on the form.
The dissent contends that because Villa knew Nika was arrested for murder, she would reasonably foresee the questionnaire would elicit an incriminating response from Nika; and therefore, she engaged in a custodial interrogation by merely *1439 reading the questionnaire. Taken a step further, if Villa knew nothing about Nika, the exact same question would not be a custodial interrogation under this analysis. We find this factual distinction unpersuasive. Villa asked the same questions of every prisoner. Villa testified she never asked for clarification from a prisoner nor did she do anything other than move on to the next question. Interestingly, when Nika’s counsel was questioned as to why this issue was not raised on appeal, he stated Nika conceded it was merely routine questioning for the purpose of classification and not a custodial interrogation.
Moreover, the safety of prisoners in custody is the purpose behind these questions. There is no getting around this type of question when trying to determine the threat, if any, a particular prisoner may pose to another. While the State can control many things, it cannot control what a prisoner might say when asked a particular question. Therefore, the district court did not err in determining that no custodial interrogation occurred.
5. Excessiveness of death sentence
NRS 177.055(2)(d) requires this court to review “[w]hether the sentence of death is excessive, considering both the crime and the defendant.” We conclude that the imposition of the death penalty was not excessive.
Smith was brutally struck in the head three times with such force that each blow fractured his skull. Dr. Sohn testified that when Smith was shot in the head, he was probably lying on his back and that the gunshot wound was the cause of death because each of the blunt trauma wounds was not independently fatal. The way that the murder appears to have occurred — three blows to the head and then the gun placed directly on Smith’s forehead and fired as he lay on the ground — was of such a heinous and gruesome nature that the imposition of the death penalty was not excessive. See Doleman v. State, 107 Nev. 409, 418, 812 P.2d 1287, 1293 (1991).
6. Passion or prejudice influencing death sentence
NRS 177.055(2)(c) requires this court to review “[wjhether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor.” Nika argues that the jury’s rejection of any mitigating factors demonstrates that the sentence was imposed under the influence of passion and prejudice. The prosecution argues that the jury’s failure to find any mitigating factors resulted from the fact that no mitigating evidence was *1440 produced at the sentencing hearing. We conclude that the jury’s failure to find any mitigating factors does not prove it acted under the influence of passion or prejudice.
The only mitigating evidence produced by Nika came from his family members, and that testimony was very limited. Rodika, Nika’s wife, testified that she believed that Nika was generally a good person, but she also admitted that Nika was violent and had threatened to kill her, her mother, and her father on separate occasions. Dorina Vukadin, Rodika’s sister, also testified for the defense. She stated that Nika played sports with her children and that her children liked him, but also that he was a stern disciplinarian. She also stated that he sometimes exposed her children to violent movies and television programs. Anna, Nika’s mother-in-law, testified for the prosecution, and her testimony was primarily concerned with Nika’s death threats against her and members of her family. On cross-examination, the only positive statement she made regarding Nika was that Nika and Rodika’s child loved Nika. We conclude, therefore, that the jury could reasonably have found that the mitigating circumstances did not outweigh the aggravating circumstances and that the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor.
Accordingly, we affirm Nika’s judgment of conviction and sentence of death.
Shearing, C. J., concurs.

 Robbie Morrow stated that around 6:20 p.m. she noticed a “junky” looking brown Chrysler on the side of the road with the hood and trunk cover *1427 up. Morrow stated that she saw someone who appeared “dirty and grubby” in very short cut-off pants, a yellow tank top shirt, and white tennis shoes lying under the front of the car, apparently checking the engine.
Robin Aguire, who was in prison at the time of trial on an unrelated drug charge, testified that she and her mother were driving on 1-80 between 6 p.m. and 6:30 p.m. and saw a brown car with its hood up. She identified Nika as the man standing next to the car.
Susan Tarbet stated that at approximately 7:20 p.m. or 7:25 p.m. she saw a man leaning against a brown car with his arms crossed. She also testified that she believed that the man she saw on the side of the road was Nika.
Jewell Waters was following her husband home from Reno and passed mile marker 34 at approximately 7:30 p.m. Jewell saw the brown Chrysler and identified Nika as the person in the car. Michael Waters, Jewell’s husband who was driving ahead of Jewell, also indicated that Nika was the man that he saw by the car.

 This call was apparently made by either Sanchez or Boling.

 Evidence showed that when the BMW was found in Chicago, it had a “National” brand battery and that the battery purchased by the Smiths in July 1994 was not a National brand battery.

 The woman whom Izzo believed to be Nika’s mother was in fact Nika’s aunt. Apparently, Nika was the maintenance man in the apartment building.

 The mitigating circumstances offered to the jury were as follows:
1. The defendant has no significant history of prior criminal activity.
2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.
3. The victim was a participant in the defendant’s criminal conduct or consented to the act.
4. The defendant was an accomplice in a murder committed by another person and his participation in the murder was relatively minor,
5. The defendant acted under duress or under the domination of another person.
6. The youth of the defendant at the time of the crime.
7. Any other mitigating circumstance.

 Nika contends that the circumstances, though they create a strong suspicion of guilt, are as consistent with a theory of innocence as they are with a theory of guilt, and that there can be no conviction under such circumstances. See State v. Cerfoglio, 46 Nev. 332, 350, 213 P. 102, 103 (1923). This argument lacks merit. It impermissibly burdens the prosecution with having to disprove all other potential suspects and theories beyond a reasonable doubt. The State’s burden in this case was to prove beyond a reasonable doubt that Nika murdered Smith. Therefore, it was not necessary to prove that Nika acted alone in committing the murder.

 There was, however, evidence in the record to support a charge for robbery since Nika was in possession of Smith’s car when he was arrested in Chicago.

 Although the jury found a robbery occurred under the “random and motiveless aggravator,” it did not find that the murder was committed by Nika during “the commission of or attempt to commit a robbery.” NRS *1438 200.033(9); NRS 200.033(4). Why the jury found facts to support a robbery under one aggravator but not another is not for this court to question. United States v. Carlos, 478 F.2d 377, 379 (9th Cir. 1973) (recognizing the jury’s role as the ultimate arbiter of facts).