WILBERT EMORY LESLIE, Appellant, v. THE
STATE OF NEVADA, Respondent.

No. 28753

January 22, 1998                              952 P.2d 966

[Rehearing denied March 23, 1998]

*Morgan D. Harris,* Public Defender, and *Robert L. Miller* and
*Roger Hillman,* Deputy Public Defenders, Clark County, for
Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart Bell,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, and *David Roger,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, SHEARING, J.:

Wilbert Leslie was convicted of burglary, robbery with the use of a deadly weapon, and murder with the use of a deadly weapon, and sentenced to death. We affirm the conviction and sentence.

### FACTS

On August 9, 1994, Prewitt was working as a clerk in a 7-Eleven store in Las Vegas. At approximately 9:00 p.m., Prewitt was shot and killed by an African-American man during a robbery of that store. Leslie was tried and convicted of the crime.

Bobby Roberts testified that at approximately 9:00 p.m. on August 9, 1994, he and his wife Lois were returning to their mobile home from grocery shopping. Bobby stated that he had parked his car in the back parking lot area of the 7-Eleven store, which placed him directly in front of his mobile home and approximately fifty feet from the 7-Eleven store. Bobby stated that the 7-Eleven store was well-lighted and that as he exited his car he saw an African-American man, whom he later identified in a photo and physical line-up and at trial, as Leslie, standing at the outside rear of the 7-Eleven store. He described Leslie as being tall with a thin face and long curly hair, wearing dark pants, a

white T-shirt, and tennis shoes. Bobby also stated that he saw a gold, luxury-type car with tinted windows pull into the 7-Eleven parking lot and saw the man approach the car and speak to the driver through the driver's side window. Lois's testimony mirrored Bobby's, and she also identified Leslie as the man she saw at the 7-Eleven.

Approximately fifteen to thirty minutes after last witnessing the man, Bobby heard sirens and a helicopter, looked out of his mobile home window, and saw police cars and an ambulance at the 7-Eleven. Bobby spoke with a police officer, learned that the clerk in the 7-Eleven had been shot, and asked the officer if an African-American had committed the crime. The officer informed Bobby that an African-American man had committed the crime, and Bobby gave the officer a statement and a description of the man he had seen at the rear of the store just minutes earlier.

Amy Eggers testified that she was a regular customer at the 7-Eleven and had arrived there shortly before 9:00 p.m. on August 9, 1994. She was playing video poker and was seated at the fifth and farthest machine from the door. She heard the door ringer, indicating that somebody had come through the front door, and looked up from her machine to see who had entered the store. An African-American man had entered the store wearing dark pants, a white T-shirt and white tennis shoes; she only saw his left profile. She looked back to her machine, but her attention was directed back to the counter area when the African-American man yelled, "Give me the money," and fired a gunshot over Prewitt's head. The gun was a black steel revolver with a wooden handle. Prewitt opened the cash register, and the assailant reached in, grabbed the money, backed away, and then shot Prewitt in the chest, killing him. After the shooting, the man turned and left the store, at which time she saw his right profile; she never saw the front of his face. After the shooting, the two other clerks who had been in the back room came out to help, and one of them called "911" for assistance. On October 12, 1994, Eggers attended a physical line-up in which Leslie was present. She saw the front of Leslie's face and both profiles and identified Leslie as the man who had shot Prewitt on August 9, 1994.

Kristen Motyka was working as a clerk in the 7-Eleven on August 9, 1994. During a lull, Kristen took a break to eat a hot dog in the back room of the store. The assailant entered the store, and Prewitt told Kristen that he would tend to the customer. Shortly thereafter, Kristen stated that she heard a "pop," which she believed was a box hitting the floor, and looked over her shoulder and around the corner to see an African-American man pointing a gun at Prewitt. She stated that the assailant was

wearing a white T-shirt, had a long "jerri curl" hairstyle, and was pointing a black revolver at the wall behind Prewitt. She heard the assailant yell, "Give me the money," heard another "pop," and then heard Prewitt say, "Call 911." Kristen was shown a photo line-up and picked Leslie's picture as the person that she believed was the man she had seen shoot Prewitt. However, at a physical line-up, Kristen picked a person other than Leslie as the man she believed shot Prewitt.[1]

Senior crime analyst David Horn testified that there was a bullet hole in the wall behind the counter approximately five to seven feet above the floor. The bullet was found in the storage area on the other side of the wall in a "Slurpee" cup box. Horn also stated that he processed the interior and exterior of the store for fingerprints, but neither he nor another crime scene analyst found any identifiable fingerprints.

The 7-Eleven store was equipped with a video surveillance system which recorded the killing. The videotape indicated that the killing occurred at 9:05 p.m. Detective Robert Leonard testified that he viewed the videotape of the killing and that Eggers' description of the assailant and how the killing occurred basically matched what was on the videotape.

On September 28, 1994, a telephone call came to Leonard through the police's Secret Witness program. The caller stated that the person who had killed the 7-Eleven clerk had told her of the crime. She identified the killer as "Wilbert," but did not know his full name because everybody called him "Tuggy." She gave the police directions to Tuggy's house, but was unsure of the exact address. The caller also told the police that they already had the murder weapon in their possession because Tuggy had sold the gun to a girl, the girl had placed the gun in her Cadillac which had been towed by the police, and when the girl got the car back the gun was not in the car. The caller never identified herself and was never identified by the police.

Leonard followed the caller's directions and eventually discovered that Leslie and his mother lived in the house that the caller had described. Leonard obtained a physical description and a photograph of Leslie and put together a photographic line-up. This photographic line-up was shown to all of the witnesses in this case.

Leonard then went to the police department to search for the gun which the caller suggested was in police custody. The bullets recovered from the 7-Eleven wall and Prewitt's body were .38 caliber, and Leonard searched for a matching gun. One of the

[1] Gary Cole, the other clerk on duty that night, was unable to identify the assailant because he was also in the back room and only briefly saw the assailant.

weapons in police custody was a .38 caliber pistol recovered from the trunk of a bronze Cadillac Fleetwood which had been impounded from a park on Gowan Road and Lincoln Road. The police had impounded the car because it had a broken rear window and they believed that the car had been stolen. The park where the car had been towed from was located two blocks south of Leslie's home and approximately one mile from the 7-Eleven.

Leonard took the gun to firearms examiner Richard Good. The gun was black with a brown grip, which matched Eggers' description of the gun. Leonard stated that the gun was supposed to be double action, meaning that when the trigger was pulled the hammer came back (was cocked) and then was released, firing a shot. However, when Good examined the gun, he discovered that the trigger would not move and that the hammer had to be manually cocked before the gun could be fired. Leonard stated that the assailant in the video could be seen manually cocking the gun and then firing it. After examining both the gun and the bullets found in the Slurpee box and Prewitt's body, Good concluded that both bullets were fired from the gun found in the trunk of the Cadillac.

Leonard identified the owner of the bronze Cadillac Fleetwood as Rhesa Gamble. Leonard contacted Gamble on October 7, 1994, and Gamble gave a recorded statement to Leonard. In her statement, Gamble stated that she and Leslie were dating and were in love, but that she did not know his full name and that she called him Tuggy. She also stated that the murder weapon had originally belonged to Leslie and that she had purchased it from him for fifty dollars. Gamble also identified Leslie's photograph from the photo line-up.

After he talked with Gamble, Leonard, along with Detective James Franks, immediately went to Leslie's house to talk with him. Franks testified that they knocked on Leslie's door and an African-American man answered. Franks asked for "Tuggy," and the man stated, "There's no Tuggy here." Franks then asked to speak to Wilbert Leslie, and the man stated that he was Wilbert Leslie. Franks and Leonard took Leslie to the police station for questioning, and during the interview, Leslie denied owning a firearm and going by the name "Tuggy." When asked if he was familiar with the bronze Cadillac, Leslie stated that he knew of many Cadillacs. When asked if he was familiar with a Cadillac owned by Rhesa Gamble, Leslie first asked, "Rhesa who?," and then stated that he knew someone named Rhesa; however, Leslie denied that Gamble was his girlfriend. When Franks told Leslie that Gamble had indicated that she had obtained the murder weapon from him, Leslie gasped and stated, "Oh no." Franks testified that Leslie was frightened, nervous, surprised, and

"totally caught off guard" by his statement. Leslie denied involvement in the killing, but at the conclusion of the interview, the police placed him under arrest.

At trial, Gamble testified that she and Leslie were dating in the summer of 1994, and Leslie went by the nickname Tuggy. On August 9, 1994, the day of the 7-Eleven killing, she drove to the 7-Eleven in her bronze Cadillac with Leslie, who was wearing a white T-shirt and dark pants, and a friend called "Big Dave." She pulled into the front parking lot of the 7-Eleven, but Leslie told her to park on the side of the store not the front; Leslie then got out of the car and told her to drive down the street. She drove down the street and then returned to the 7-Eleven, and Leslie was still standing on the side of the 7-Eleven in the same place where she had dropped him off. Leslie approached the car and spoke to her through the driver's window, telling her to drive down the street and to then return.

When Gamble and Big Dave returned to the 7-Eleven, Leslie was walking down the street away from the 7-Eleven. Leslie, appearing nervous, got into the car, told Gamble to drive away, and asked her and Big Dave if they had heard any gunshots. Leslie then began yelling, "I killed him." When she asked him what had happened, Leslie stated that he had killed the clerk because the clerk would not give him the money. She kept the murder weapon in her car because she did not want Leslie to have it, and on September 2, 1994, she left her car near Leslie's house because the battery was dead; when she returned to retrieve the car the next day it had been towed away. She later told a friend, Shanee Lakes, that she had been present at the 7-Eleven with Leslie and Big Dave when Prewitt was killed.

At trial, Shanee Lakes testified that Gamble had confessed to her presence at the 7-Eleven with Leslie and Big Dave when Prewitt was killed. She also stated that Gamble had told her that Leslie had robbed and shot the clerk. Rochelle Jones, another of Gamble's friends, testified that Gamble had told her that she went to the 7-Eleven with Leslie and that Leslie had gone into the 7-Eleven while she waited inside the car.

Leslie did not testify at trial, but several witnesses testified on his behalf. Michael Johnson, Orbey Mitchell, Randy Brumfield, and Richard Cheesbro, all testified generally as follows. On the day of the killing, they, along with Leslie (whom they knew as Tuggy), went to a basketball game at the Doolittle Community Center. They all met at Johnson's house around 6:00 p.m., and they then went to pick up several more friends at a house on Ferguson Street, staying at that house for approximately one or two hours. The game began at approximately 10:00 p.m., and they stayed at the game until approximately midnight, at which time they all went back to the house on Ferguson Street.

At the conclusion of trial, the jury found Leslie guilty on all counts—burglary, robbery with the use of a deadly weapon, and first degree murder with the use of a deadly weapon. At the penalty phase, the State alleged four aggravating circumstances: the murder was committed by a person who knowingly created a great risk of death to more than one person by means of a weapon, device or course of action which would normally be hazardous to the lives of more than one person; the murder was committed while Leslie was engaged in the commission of or an attempt to commit or flight after committing or attempt to commit a burglary; the murder was committed while Leslie was engaged in the commission of or an attempt to commit or flight after committing or attempting to commit a robbery; and the murder was committed upon one or more persons at random and without apparent motive.

Leslie presented mitigating evidence from his father who stated that Leslie had done well in high school and was a loving child with a good heart. Leslie's sister testified that they had a close family and that Leslie was a good person. Leslie's mother testified that Leslie was a good son and had always been respectful and obedient.

At the conclusion of the penalty phase, Leslie was assessed the death penalty by the jury for the murder charge because the jury found that all four aggravating circumstances had been proven beyond a reasonable doubt and that they outweighed the mitigating circumstance—that Leslie had no significant criminal history. Leslie was also sentenced to ten years imprisonment for the burglary charge and fifteen years imprisonment for the robbery charge, plus a consecutive fifteen years imprisonment for the use of a deadly weapon enhancement.

## DISCUSSION

*The district court did not commit reversible error by allowing into evidence the testimony of a witness with whom the State had reached a plea bargain*

Leslie argues that the State improperly bargained for Gamble's particularized testimony and that the district judge improperly admitted Gamble's testimony into evidence. We disagree.

Gamble gave a recorded statement to Leonard on October 7, 1994, stating that she bought the gun from Leslie. On December 1, 1994, Gamble testified at a grand jury hearing convened to investigate Prewitt's death. Gamble's testimony at the grand jury hearing was similar to her earlier recorded statement except that she stated at the grand jury hearing that she had not purchased the gun from Leslie and instead had purchased it from a man on the

street near the Opera House casino. She also stated that she had never spoken to Leslie about the 7-Eleven killing and had never told anybody that she was present at the 7-Eleven on the night of the killing. During her testimony, the district attorney stopped the proceedings to counsel Gamble about the penalty for perjury, and Gamble indicated that she was telling the truth.

On December 22, 1994, a preliminary hearing was held. Gamble's testimony mirrored that given to the grand jury. After Detective Franks testified as to Gamble's recorded testimony regarding her purchasing the gun from Leslie, Gamble was recalled to the witness stand and asked specifically whether she had been in the car parked outside of the 7-Eleven with a man named Big Dave on the night that Prewitt was killed. Gamble answered the question in the negative. The justice of the peace cautioned Gamble that she could face perjury charges if she did not testify truthfully. Gamble concluded her testimony by stating that she had never told her friends Shanee Lakes and Rochelle Jones that she was with Leslie and Big Dave when Prewitt was killed. Shanee Lakes then testified that Gamble had told her over the telephone that she was with Leslie and Big Dave when Prewitt was killed, and Rochelle Jones testified that Gamble had told her that she was at the 7-Eleven when Prewitt was killed.

At the conclusion of the preliminary hearing, the justice of the peace stated that he believed that Gamble had lied under oath and asked the State to consider bringing perjury charges against her. The deputy district attorney requested permission to charge Gamble with perjury immediately; the court agreed and addressed Gamble directly and informed her that probable cause existed to believe that she had lied under oath. Gamble was placed under arrest at that time.

The State filed an information on February 13, 1995, charging Gamble with murder with the use of a deadly weapon, accessory to a felony, burglary, robbery with the use of a deadly weapon, and perjury. On February 14, 1995, Gamble signed a Guilty Plea Memorandum in which she pleaded guilty to perjury and the State agreed to drop the other charges and recommend a ten-year suspended sentence and probation. The guilty plea memorandum stated:

> I testified that I knew nothing about Wilbert Leslie's participation in the robbery and murder of William Prewitt inside a 7-11 store on North Nellis on August 9, 1994. That testimony was false because I had driven Leslie to the 7-11 and waited for him outside in my car. When Wilbert Leslie came out of the 7-11 he told me he had shot the clerk because he refused to give him money.

Gamble also agreed to cooperate with the State in the case against Leslie and to testify truthfully in that case, and acknowledged that the guilty plea agreement would be nullified if she did not testify truthfully.

Leslie argues that this agreement to cooperate constituted an improper bargaining for particularized testimony. *See* Sheriff v. Acuna, 107 Nev. 664, 669, 819 P.2d 197, 200 (1991).

We conclude that the State did not improperly bargain for particularized testimony. Gamble was charged with perjury and the other charges because evidence of her October recorded statement to the police and the testimony of Shanee Lakes and Rochelle Jones all indicated that Gamble was present at the 7-Eleven with Leslie and that Leslie had sold her the murder weapon, contrary to her later testimony. In her plea agreement, Gamble admitted to giving perjurious testimony at the two previous proceedings and admitted that she drove Leslie to the 7-Eleven. Furthermore, the Agreement to Cooperate memorandum stated only that Gamble agreed to testify "truthfully" at Leslie's trial, as determined by the court. This requirement is in accord with NRS 174.061(1)(b), which states that if a defendant agrees to testify for the prosecution against another defendant in exchange for a reduced sentence, the agreement "[m]ust be in writing and include a statement that the agreement is void if the defendant's testimony is false."

Leslie argues that the prosecution dictated to Gamble what the "truth" was by virtue of the fact that she was charged with perjury for her testimony at the two previous proceedings and, therefore, that this case is substantially similar to People v. Medina, 116 Cal. Rptr. 133, 135 (Ct. App. 1974) (concluding that the prosecution improperly bargained for particularized testimony when it granted defendants immunity in return for testimony on the condition that "the witness not materially or substantially change her testimony from her tape recorded statement already given to law enforcement officers"). We conclude that Leslie's argument lacks merit. Credible evidence, including Gamble's original statement to the police, her possession of the murder weapon, the testimony of Shanee Lakes and Rochelle Jones, and wiretap recordings of conversations between Shanee and Gamble, all indicated that Gamble was present with Leslie at the 7-Eleven. Therefore, pursuant to *Acuna,* the prosecution was permitted to bargain for specific testimony essentially consistent with the information represented to be factually true during Gamble's negotiations with the State. *Acuna,* 107 Nev. at 669, 819 P.2d at 200.

Leslie also argues that the State's action in charging Gamble

with numerous crimes constituted an improper interference with a potential defense witness which "effectively drove that witness off the stand, and thus deprived [the appellant] of due process of law under the Fourteenth Amendment." Webb v. Texas, 409 U.S. 95, 98 (1972). We disagree and note that the facts in *Webb* are distinctly different from those presented in the case at bar. In *Webb,* the judge told the defendant's only witness prior to testifying about the penalty for perjury and that he expected the witness to lie, and also informed the witness, who was serving a prison sentence at the time, that a conviction of perjury would hurt the witness' chances of parole. *Id.* at 97. The Supreme Court stated that such threatening remarks effectively drove the witness off the stand and deprived the defendant of due process. *Id.* at 98.

No such threats were made in the instant case. The prosecutor and justice of the peace warned Gamble about perjury only after hearing some of her testimony, and the warnings were not threatening as were those in *Webb*. Furthermore, the district court did not err in advising Gamble of the consequences of perjury or in cautioning her about testifying truthfully. State v. Martinez, 653 P.2d 879, 884 (N.M. Ct. App. 1982).

*The prosecutor did not engage in misconduct which deprived Leslie of a fair trial*

In the guilt phase closing argument, the prosecutor made the following statement:

> And on cross-examination, [Gamble] very freely discussed how detectives allegedly planted information with her, how detectives allegedly told her that number two in the photographic lineup was Tuggy before she even saw it. *We now know that's incorrect.*

In opening arguments during the penalty phase of the trial, the prosecutor stated the following:

> Obviously, this is a case that will not be soon erased in your minds. *You are also, perhaps to a certain extent, victims.* You will perhaps never forget the video tape that you saw of this killing by the defendant.

During the penalty phase closing argument, the prosecutor allegedly implied that there was a presumption in favor of finding the death penalty over life with or without the possibility of parole when the aggravating circumstances outweighed the mitigating circumstances, stating:

> I suggest to you that [Leslie] does have a substantial criminal history.
> But even if you disagree with our perspective, you have to

ask yourself the important question: Is this enough to mitigate the death penalty, mitigate these aggravating circumstances? *Is this enough to say that he doesn't deserve the ultimate punishment in this case?*

Leslie argues that each passage emphasized above constituted prosecutorial misconduct; however, Leslie failed to object to the statements and the issues were not preserved for appeal. Miranda v. State, 101 Nev. 562, 570, 707 P.2d 1121, 1126 (1985). We conclude that they certainly do not constitute plain error. Therefore, we will not address the propriety of these statements.

However, in the penalty phase closing arguments, the prosecutor stated:

> We also take a look at what is the message that we are to send to the defendant and others like him in society?
>
> By your verdict, you will be sending a message to society. You'll be sending a message to future 7-Eleven, AM/PM robbers.

Leslie's counsel objected to this statement. However, we have recently concluded in Witter v. State, 112 Nev. 908, 924-25, 921 P.2d 886, 897-98 (1996), that such statements were proper as they only focused on what the appropriate punishment should be under the facts presented, as well as what was necessary to deter others from committing such an act.

*The trial court did not erroneously admit dubious and tenuous evidence of character at the penalty hearing*

Leslie argues that the trial court erred by admitting into evidence at the penalty phase two items of testimony which constituted dubious and tenuous evidence of Leslie's character. First, over the objection of Leslie's counsel, Franks testified that the murder weapon recovered from Gamble's car was registered to a Mr. Henry Washington. Franks testified that Washington told him that the weapon was his and that an unknown woman had taken the gun and traded it for rock cocaine in 1990 or 1991. However, through some type of error with the police, no report of the theft was filed.

"The decision to admit particular evidence during the penalty phase is within the sound discretion of the trial court, and will not be overturned absent an abuse of discretion. The evidence must be relevant and must be more probative than prejudicial." Pellegrini v. State, 104 Nev. 625, 631, 764 P.2d 484, 488 (1988) (citations omitted). Leslie argues that the evidence of the stolen

gun was overly prejudicial because no evidence was presented that Leslie stole the gun or knew that the gun was stolen. However, we conclude that the district court's decision to admit Franks' testimony was not an abuse of discretion. The evidence was relevant because it helped to prove that the gun was not registered to Leslie and that Leslie knew that the gun was stolen. Additionally, on cross-examination, Franks testified that he did not know how the gun got into Leslie's possession, thereby negating the inference that Leslie had stolen the gun from its registered owner. Therefore, the evidence could clearly be considered more probative than prejudicial by the district judge.

Furthermore, the prosecution attempted to use the evidence of the stolen gun to prove that Leslie had a significant history of prior criminal activity. However, the jury concluded that sufficient evidence supported the mitigating circumstance that Leslie had no significant history of prior criminal activity. Therefore, Leslie was not prejudiced by Franks' testimony.

The second alleged error was that the district judge permitted Kenneth O'Rourke, a detention center officer, to testify concerning Leslie's confinement in the county jail, specifically as to an incident which occurred on April 11, 1995. O'Rourke testified that on that day, Leslie was late for a medication call, swore at O'Rourke, grumbled when he was told to return to his cell, and repeated all of the questions that O'Rourke asked him. O'Rourke filed a report regarding this incident and testified that other disciplinary reports regarding similar behavior had also been filed. None of those reports involved violence.

Leslie argues that this testimony was trivial and too tenuous to be considered in deciding whether to impose a sentence of death, citing Allen v. State, 99 Nev. 485, 665 P.2d 238 (1983). We conclude that while the evidence had little probative value, it also had little prejudicial effect; therefore, the decision to admit it was not an abuse of discretion.

*Evidence did not support the finding of one of the aggravating circumstances*

NRS 177.055(2)(b) requires this court to examine the record to determine whether evidence supports the finding of an aggravating circumstance. Four aggravating circumstances were presented to the jury, and the jury found that all of the aggravating circumstances were proven beyond a reasonable doubt. We conclude that evidence existed to support the jury's finding of three of the aggravating circumstances.

*Evidence did not support the jury's finding that the murder was committed by a person who knowingly created a great risk of death to more than one person*

The prosecutor asked the jury to find, pursuant to NRS 200.033(3), that the murder was committed by a person who knowingly created a great risk of death to more than one person by means of a weapon, device, or course of action which would normally be hazardous to the lives of more than one person based on the fact that Kristen and Cole were in the storage room where Leslie's first bullet (fired into the wall over Prewitt's head) lodged. We conclude that evidence did not exist to support the jury's finding beyond a reasonable doubt that Leslie *knowingly* committed a great risk of death to more than one person. Therefore, the jury's finding of NRS 200.033(3) was improper.

No evidence was presented at either the guilt phase or the penalty phase that Leslie knew that the two clerks were in the storage room. Kristen's testimony was as follows:

> I got a hot dog and started walking towards the back of the room when somebody came in. I went to put the hot dog down to go to the register, and [Prewitt] told me, "No, I'll get it. You finish eating your dinner."

The prosecutor argues that because Kristen stated that she was "walking towards the back of the room when somebody came in," it is possible that Leslie could have seen Kristen walk into the storage room. Kristen testified that she had been worried that Leslie might have seen her upon entering the store, but this testimony does not support the jury's finding that, beyond a reasonable doubt, Leslie saw Kristen.

Cole testified that he was tending to the hot dog stand and had stepped into the back room around the same time that Leslie entered the room. There was no testimony regarding whether Leslie saw Cole, and Cole was unable to describe Leslie other than to say that he was black and had curly hair.

Based on Moran v. State, 103 Nev. 138, 734 P.2d 712 (1987),[2] the jury's finding that this aggravating circumstance was proven beyond a reasonable doubt was not supported by evidence. Neither Kristen nor Cole stated that they had made eye contact with

---

[2]In *Moran*, Moran shot seven bullets at his ex-wife, five of which entered her body and two of which passed through a wall of an adjacent apartment. This court stated that because nobody else was present in the apartment when Moran shot his ex-wife, and because there was no evidence that any neighbor was at an immediate risk of death, or that Moran was aware that any other person was within close proximity of the crime scene, the finding of an aggravating circumstance pursuant to NRS 200.033(3) was improper  Moran v. State, 103 Nev. 138, 142, 734 P.2d 712, 714 (1987).

Leslie or that Leslie gave them any indication that he knew they were in the storage room. Furthermore, the prosecutor's argument that evidence of NRS 200.033(3) existed because Kristen and Cole were fearful for their lives lacks merit; based on the plain language of the statute, Kristen's and Cole's state of mind was irrelevant.

*Evidence supported the jury's findings that the murder was committed while the person was engaged in the commission of or an attempt to commit or flight after committing or attempt to commit a burglary or robbery*

The jury had previously convicted Leslie of burglary and robbery in the guilt phase. Evidence presented from Eggers, Kristen, Cole, and Gamble all indicated that the killing took place either during the robbery or the flight after committing a robbery. This testimony provided evidence to support the jury's finding that the murder was committed during a robbery or flight after a robbery pursuant to NRS 200.033(4).

Additionally, Gamble's testimony that Leslie had entered the store with the intent to commit a robbery therein, and other evidence, namely the fact that Leslie entered the store with a gun, provided evidence to support the jury's finding that the murder was committed during a burglary or flight after committing a burglary pursuant to NRS 200.033(4).

*Evidence supported the jury's finding that the murder was committed upon one or more persons at random and without apparent motive*

We have stated that a murder can be random and without apparent motive if the killing of a person was not necessary to complete a robbery. Bennett v. State, 106 Nev. 135, 143, 787 P.2d 797, 802 (1990). Evidence indicated that Leslie had received the money and could have left the store unfettered, but killed Prewitt anyway. Therefore, we conclude that evidence supported the jury's finding that the murder was random and without apparent motive pursuant to NRS 200.033(9).

*The jury's death sentence can still be maintained*

Because one of the aggravating circumstances was not supported by substantial evidence and must be vacated, we will reweigh the remaining aggravating circumstances against the mit-

igating circumstance—that Leslie had no significant criminal history. Witter v. State, 112 Nev. 908, 929, 921 P.2d 886, 900 (1996). We did the same in Libby v. State, 109 Nev. 905, 859 P.2d 1050 (1993), *overruled on other grounds by* Libby v. State, 516 U.S. 1037, 116 S. Ct. 691 (1996).

Because the facts supporting the mitigating circumstance have "unequal persuasive impact" when compared with those supporting the aggravating circumstances, we affirm Leslie's death sentence. *Libby*, 109 Nev. at 918, 859 P.2d at 1058. The facts showed that Leslie committed the killing during the robbery, and that he shot Prewitt after he had taken the money from the cash register and was exiting the store. Based on the evidence, Leslie was escaping from the scene of the crime unfettered when he shot Prewitt apparently solely because Prewitt did not give him the money fast enough.

We conclude that the aggravating circumstances far outweigh the mitigating circumstance. Therefore, we will uphold the jury's death sentence.

*The sentence of death was not excessive and was not imposed under the influence of passion or prejudice*

NRS 177.055(2)(d) requires this court to review "[w]hether the sentence of death is excessive, considering both the crime and the defendant." We conclude that the sentence of death was not excessive. As stated above, Leslie had already completed the robbery of the store and was escaping from the crime scene, Prewitt was not chasing Leslie, and Prewitt had not pulled a gun or threatened Leslie in any way. The murder was cold-blooded, and it is clear that the death sentence was not excessive.

NRS 177.055(2)(c) requires this court to review "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor." We conclude that the sentence of death was not imposed under the influence of passion, prejudice, or any arbitrary factor. The jury heard evidence relating to both the aggravating and mitigating circumstances and concluded that the aggravating circumstances outweighed the mitigating circumstance. Therefore, we conclude that the sentence of death was not imposed under the influence of passion, prejudice, or any arbitrary factor.

## CONCLUSION

The prosecutor neither improperly bargained for Gamble's particularized testimony nor improperly interfered with a defense witness. Additionally, the prosecutor did not engage in any mis-

conduct. Furthermore, the district judge did not err in permitting the introduction of evidence of Leslie's character during the penalty phase of the trial because its probative value outweighed its prejudicial effect. Furthermore, while evidence did not exist to support the jury's finding of an aggravating circumstance under NRS 200.033(3), Leslie's death sentence is still affirmed because the remaining aggravating circumstances outweighed the mitigating circumstance. Finally, the death sentence was not excessive and was not imposed under the influence of passion or prejudice.

YOUNG and MAUPIN, JJ., concur.

SPRINGER, C. J., concurring:

I concur in the majority's affirming the death penalty, but I disagree with its "reweigh[ing] the remaining aggravating circumstances against the mitigating circumstances." *See* Canape v. State, 109 Nev. 864, 859 P.2d 1023 (1993) (Springer, J., concurring in part and dissenting in part). I concur because I conclude that, as a matter of law, mitigating circumstances cannot outweigh the aggravating circumstances in this case.

ROSE, J., concurring:

The jury was instructed that it could find that the murder was committed upon one or more persons at random and without apparent motive "if the robbery which preceded the murder could have been completed without killing the victim." This instruction is based upon our holding in Bennett v. State, 106 Nev. 135, 143, 787 P.2d 797, 802 (1990). However, as I expressed in my dissent in Nika v. State, 113 Nev. 1424, 951 P.2d 1047 (1997), this interpretation of the phrase "random and motiveless" expansively broadens this aggravator when the goal of establishing aggravators is to narrow the scope of those who are eligible for the death penalty. This expansive interpretation is not a logical extension of this aggravator and it has become a catchall for prosecutors in death penalty cases.

In cases where it is not reasonably clear that the "random and motiveless" aggravator could apply, the definition of the three operative words (i.e. apparent, random, motive) should be given as I explained in my dissent in *Nika*. The facts of this case are anything but what an average person would think was a random and motiveless killing; therefore, it was essential that a definition be given for these terms used to assist the factfinder.

The facts of the case also establish that the "random and motiveless" aggravator was not applicable. The testimony the prosecution presented indicated that Leslie waited outside of the 7-Eleven prior to robbing the store, apparently casing the store to

see if he could rob it, and only killing Prewitt after entering the store and demanding money from him. Leslie killed Prewitt because Prewitt would not give him the money immediately and, therefore, "the killing was directed at a specific individual." Geary v. State, 112 Nev. 1434, 1446-47, 930 P.2d 719, 727 (1996). Only our tortured, expansive interpretation of this "random and motiveless" aggravator in *Bennett* would permit a factfinder to reach the conclusion that this aggravator was proven beyond a reasonable doubt.

However, there are two aggravators that the jury found which are supported by overwhelming evidence, that Leslie committed the murder while he was engaged in the commission of both a burglary and robbery. These two aggravators are sufficient to support the jury's death penalty verdict. Therefore, I join with the majority in affirming both the first degree murder conviction and the death penalty imposed.