THE STATE OF NEVADA, APPELLANT/CROSS-RESPONDENT, v. EDWARD GORDON BENNETT, RESPONDENT/CROSS-APPELLANT.

No. 38934

December 30, 2003 81 P.3d 1

GIBBONS, J., dissented in part. BECKER, J., dissented.

*Brian Sandoval,* Attorney General, Carson City; *David J. Roger,* District Attorney, and *Clark A. Peterson, Lynn M.*

*Robinson,* and *James Tufteland,* Chief Deputy District Attorneys, Clark County, for Appellant/Cross-Respondent.

*Franny A. Forsman,* Federal Public Defender, and *Michael L. Pescetta,* Assistant Federal Public Defender, Las Vegas, for Respondent/Cross-Appellant.

Before the Court En Banc.

# OPINION

By the Court, AGOSTI, C. J.:

In 1988, Edward Gordon Bennett and his accomplice Joseph Beeson attempted to rob a clerk at a Stop N' Go Market in Las Vegas. Bennett shot and killed the clerk, and Beeson shot but did not kill a customer. Bennett was convicted of murder and sentenced to death. Bennett unsuccessfully sought relief on direct appeal and in a prior post-conviction proceeding. In this second post-conviction proceeding, the district court granted Bennett's petition in part by vacating his death sentence and granting him a new penalty hearing. The State appeals from that part of the district court's order, and Bennett cross-appeals from that part of the district court's order denying his remaining claims.

The district court concluded that Bennett did overcome the procedural bars to his untimely, successive petition by demonstrating that the State violated the requirements of *Brady v. Maryland*[1] and by further demonstrating that the district court in the first post-conviction proceeding prevented Bennett's counsel from adequately investigating the case. We conclude that the district court properly determined that the State violated *Brady*. In addition, we conclude that the "at random and without apparent motive" aggravator is invalid in this case. In our view, these combined errors seriously undermine the reliability of the jury's sentencing determination. Therefore, we affirm that portion of the district court's order directing a new penalty hearing. We also conclude that the district court properly declined to grant relief on any of the remaining claims in Bennett's petition.

## FACTS

On February 8, 1988, Edward Bennett purchased a handgun from a pawn shop in Provo, Utah, and traveled to Las Vegas with Joseph Beeson. The next day, Bennett and Beeson entered a Stop N' Go Market in Las Vegas. A customer, Derrick Franklin, entered soon thereafter and went to the back of the store. Beeson placed a piece of candy on the counter, as if he were making a purchase. As Michelle Moore, the store clerk, rang up the candy, Bennett pulled out his gun and shot her in the face. She was killed instantly. Bennett then gave the gun to Beeson. While Bennett jumped over the counter and unsuccessfully attempted to open the cash register,

---

[1]373 U.S. 83 (1963).

Beeson approached Franklin. Franklin pleaded for his life and then ran from the store as Beeson shot at him. Franklin was struck in the leg. Bennett and Beeson chased him out on to Maryland Parkway and then finally retreated. Franklin survived his wound.

On March 5, 1988, Bennett, who had returned to Utah, told his friend, Jeffrey Chidester, about the murder. According to Chidester, Bennett bragged about his and Beeson's "killing spree." Chidester reported this to the Utah police, who contacted the Las Vegas Metropolitan Police Department (LVMPD). Chidester was then told that he was entitled to a reward for providing the information. He received a total of $32,000.

The Utah police obtained a warrant to search Bennett's house in Utah, where they seized clothing and various writings. In Las Vegas, Bennett's fingerprints were found on the Stop N' Go Market door and cash register counter. Police also determined that the gun used to kill Michelle Moore was purchased by Bennett at a pawn shop in Utah.

Bennett was subsequently arrested and charged with attempted robbery with the use of a deadly weapon, murder with the use of a deadly weapon, and attempted murder with the use of a deadly weapon. Bennett was tried by a jury and was convicted of all counts.

At his penalty hearing, Bennett presented many witnesses, including a social worker from an outpatient substance abuse center that Bennett had attended. She testified that Bennett had problems with alcohol and drugs, including marijuana, LSD, and cocaine. She further testified that he was influenced by his peers, suffered from depression, had suicidal tendencies, and suffered from dyslexia. Bennett's former employer testified that Bennett was hardworking, smart, nonproblematic, and dependable and that Bennett looked up to and bragged about Beeson. The principal of Bennett's school testified that Bennett entered an alternative program after ninth grade due to his dyslexia, that heavy metal music seemed to lead Bennett in the wrong direction due to its hypnotic effect, that this music may have led him to drugs, and that Bennett now wanted to be an example to other kids so they would not make his same mistakes. Bennett's seminary school principal testified that Bennett was a good student, had turned his life to God after his arrest, and wanted the principal to tell Bennett's story to others to save them from the evils of hell. Bennett's brother testified that Bennett had always been a very caring person but changed about a year before his arrest and became distant, unkempt, and withdrawn. An expert in satanism and heavy metal music analyzed songs that Bennett listened to before committing the crimes and testified that the writings found in Bennett's room were not satanic in nature but similar to heavy metal lyrics.

Bennett stated in allocution that he had many problems in school which led him to drugs. He said he was very influenced by Beeson

and changed during their friendship. He listened to heavy metal songs and wrote similar lyrics. He was not a devil worshiper but did toy with it on occasion, and he dealt drugs and robbed to support his drug habit. He described the day of the crimes and stated that his plan was to rob but not to kill, that he went to one store but moved on because it had bulletproof glass and that he then decided on the Stop N' Go. He also claimed that he blacked out once they reached the store. He apologized for what happened and stated that if he lived he could help others.

Finally, Bennett's father testified that Bennett was an active, happy, and helpful youth. Bennett had problems in school because of his dyslexia and dropped out after the tenth grade. He always treated his family nicely and was never in any trouble until a year before his arrest when he became friends with Beeson and his appearance and attitude changed. Bennett's father also stated that his family was religious and that Bennett wanted to help others.

The State also presented many witnesses at the penalty hearing. Utah police detective Gary Caldwell testified about his previous arrest of Bennett for possession of drugs and paraphernalia. Two Utah police officers and two boys testified about an incident when Bennett and Beeson were driving and Bennett shot a pellet gun at the two boys as they walked on the street. The State also presented testimony of the officers who had executed the search warrants in the instant case and recovered witchcraft books, handwritten poetry or song lyrics discussing death and killing, and heavy metal music cassettes. A handwriting expert testified that the poetry or lyrics were in Bennett's handwriting. He read some of the writings, such as "As I kill and kill again." Last, Jeffrey Chidester testified to what Bennett told him about the crimes. Chidester admitted that he had ingested drugs after Bennett confessed to him.

At the conclusion of the penalty hearing, the jury found four aggravating circumstances: (1) in committing the murder, Bennett knowingly created a great risk of death to more than one person; (2) the murder was committed while Bennett was engaged in the commission of a burglary; (3) the murder was committed while Bennett was engaged in attempted robbery; and (4) the murder was committed at random and without apparent motive. The jury found three mitigating circumstances: (1) Bennett's lack of a criminal history, (2) Bennett's youth, and (3) Bennett's alcohol and drug usage. The jury determined that the aggravating circumstances outweighed the mitigating circumstances and rendered a verdict of death.

On direct appeal, this court affirmed Bennett's judgment of conviction and death sentence.[2] In November 1990, Bennett, in proper person, filed a timely petition for post-conviction relief.

---

[2]*See Bennett v. State,* 106 Nev. 135, 787 P.2d 797 (1990) (*Bennett I*), *overruled in part by Leslie v. Warden,* 118 Nev. 773, 59 P.3d 440 (2002).

The district court appointed counsel to represent Bennett, but no further proceedings were calendared. More than three years passed before Bennett's counsel filed a second document raising additional claims. The district court dismissed Bennett's petition, he appealed, and this court affirmed the district court's dismissal.[3]

On July 7, 1998, Bennett filed a second post-conviction petition for a writ of habeas corpus in the district court. The district court appointed the Federal Public Defender to represent Bennett. The State opposed the petition on the grounds that it was successive and untimely. The district court conducted several evidentiary hearings to determine if Bennett could demonstrate good cause and prejudice to overcome the procedural bars. Bennett claimed that the State had violated *Brady,* that his first post-conviction counsel was ineffective in failing to assert an absence of mitigating evidence at his penalty hearing, and that the district court erred in preventing first post-conviction counsel from investigating the case.

The district court determined that Bennett had demonstrated good cause and prejudice to overcome the procedural bars due to violations of *Brady* and due as well to the district court's denial of his request for an investigator to assist prior post-conviction counsel. The district court vacated Bennett's death sentence, granted a new penalty hearing, and presumably dismissed the remainder of Bennett's claims. The State appeals the district court's decision vacating Bennett's death sentence and ordering a new penalty hearing. Bennett cross-appeals the denial of the remainder of his claims.

## DISCUSSION

### 1. The invalid "at random and without apparent motive" aggravator

The jury found four aggravating circumstances: (1) in committing the murder, Bennett knowingly created a great risk of death to more than one person; (2) the murder was committed while Bennett was engaged in the commission of a burglary; (3) the murder was committed while Bennett was engaged in attempted robbery; and (4) the murder was committed at random and without apparent motive. On direct appeal, Bennett unsuccessfully challenged the last three aggravators.[4] Bennett again challenges these aggravators, and we conclude that the challenge to the "at random and without apparent motive" aggravator has merit.

Bennett claims, based upon this court's recent ruling in *Leslie v. Warden,* that the jury's finding of this aggravator was erroneous.[5]

---

[3]*Bennett v. State,* 111 Nev. 1099, 901 P.2d 676 (1995).

[4]*See Bennett I,* 106 Nev. at 141-43, 787 P.2d at 801-02.

[5]118 Nev. 773, 59 P.3d 440.

The State relies, in response, upon the doctrine of the law of the case, noting that this court considered and rejected this identical claim in Bennett's direct appeal. At oral argument before this court, the State also argued that this aggravator was valid because Bennett and Beeson were on a killing spree, which the State contends constitutes random, motiveless conduct.

Although Bennett challenged this aggravator on direct appeal, this court more recently held in *Leslie* that our 1990 opinion affirming Bennett's conviction and sentence overstated the applicability of this aggravator[6] to robbery-related killings.[7] We held in *Leslie* that "the 'at random and without apparent motive' aggravator is inappropriate when it is solely based upon the fact that the killing was unnecessary to complete the robbery."[8] Our primary concern was that such broad application ignored the plain meaning of the key words of the aggravating circumstance: "Typically, the victim is not selected randomly. And often a robber has a discernible motive for killing someone who can identify him or who attempts to impede the robbery."[9] *Leslie* consequently overruled our 1990 decision in Bennett's case on this issue.[10] Under these circumstances, the doctrine of the law of the case cannot be applied; to do so would unfairly impose a legal application upon Bennett which we expressly overruled, citing to our published opinion disposing of his direct appeal.[11]

Bennett raises this claim in an untimely and successive post-conviction habeas petition.[12] Therefore, he must demonstrate that good cause exists for raising this claim again and that prejudice would result if the claim is not considered, or absent good cause, he must show that a fundamental miscarriage of justice would result from this court's failure to consider the claim.[13] In *Leslie,* we concluded that Leslie demonstrated a fundamental miscarriage of justice because he was "actually innocent of the 'at random and without apparent motive' aggravator" and a reasonable probability existed "that absent the aggravator the jury would not have imposed

[6]NRS 200.033(9).

[7]*See Leslie,* 118 Nev. at 780, 59 P.3d at 445.

[8]*Id.*

[9]*Id.* at 781, 59 P.3d at 446.

[10]*See id.*

[11]*See Pellegrini v. State,* 117 Nev. 860, 885, 34 P.3d 519, 535-36 (2001) (recognizing this court's "discretion to revisit the wisdom of its legal conclusions when it determines that further discussion is warranted").

[12]*See* NRS 34.726; NRS 34.810.

[13]*See* NRS 34.810; *Pellegrini,* 117 Nev. at 886-87, 34 P.3d at 537; *see also Mazzan v. Warden,* 112 Nev. 838, 842, 921 P.2d 920, 922 (1996).

death.''[14] Similarly, we conclude that the finding of the improper aggravator in this case, combined with the prejudicial impact of the *Brady* violations identified below, so undermined the reliability of the jury's sentencing determination that the application of procedural bars to preclude consideration of Bennett's claim would amount to a fundamental miscarriage of justice.

The facts of this case do not support the finding that Bennett killed the store clerk at random and without apparent motive. The State has shown only that Bennett unnecessarily killed the clerk in connection with the attempted robbery. This is insufficient to prove that the murder was committed at random and without apparent motive.[15] It is undisputed that Bennett and Beeson chose their victim for a specific purpose—to rob her. And the motive to kill was apparent—to complete the robbery and leave no witnesses. After shooting the clerk, Bennett jumped over the counter and attempted to open the cash register. By shooting her, he eliminated any resistance or obstruction on her part. The motive to eliminate witnesses is also apparent. In addition to killing the clerk, Bennett and Beeson attempted to kill the only other person in the store. The State also had evidence of this motive from a jailhouse informant, discussed below, who reported that Beeson said he and Bennett intended to kill all witnesses.[16]

At oral argument before this court, the State asserted that because Jeffrey Chidester said that Bennett later claimed that he and Beeson were on a "killing spree," the two indulged in mindless violence and thus committed the murder at random and without apparent motive. Considering the record as a whole, Bennett's boast to Chidester carries little weight. In addition to the facts discussed above, the record shows that Beeson and Bennett cased other stores prior to the Stop N' Go. They entered one of the stores but left because bulletproof glass surrounded the cash register. This reflects purposeful, considered—not random—behavior. And although, according to Chidester, Bennett also claimed that after the crimes at the Stop N' Go he and Beeson went to other stores to shoot somebody, another shooting never occurred. Thus, Bennett's subsequent boasting about a "killing spree" lacks any specific facts to support it and falls far short of overcoming the facts establishing that he and Beeson acted deliberately and with motive in murdering the store clerk.

Consequently, the record does not support the finding of this aggravator based upon our reasoning in *Leslie*.[17] As we discuss below,

---

[14]*Leslie*, 118 Nev. at 780, 59 P.3d at 445.

[15]*See id.* at 780, 59 P.3d at 446.

[16]*See infra* note 27 and accompanying text.

[17]We are not asked to decide the validity of this aggravator under all circumstances, but it is conceivable that a murder associated with a robbery or

we are unable to conclude beyond a reasonable doubt that the jury would have returned a sentence of death without this aggravating circumstance and in the absence of the State's *Brady* violations— violations that prevented Bennett from presenting significant mitigating evidence to the jury.

### 2. *The State's appeal:* Brady *claims*

The State contends that the district court erred in granting Bennett's petition based upon the State's alleged violations of the disclosure requirements of *Brady v. Maryland*.[18] Because these issues involve both questions of fact and law, we have conducted a de novo review of the district court's decision.[19]

Bennett claims that the State violated *Brady* by failing to disclose to the defense various exculpatory items of evidence. The district court found that the State violated *Brady* by withholding evidence of a statement made by a jailhouse informant, but the district court's order is not clear as to whether it found violations relating to any other items of evidence. We conclude that violations occurred in regard to three items: the statement made by the jailhouse informant, Beeson's criminal records, and information that a witness was a paid informant.

"*Brady* and its progeny require a prosecutor to disclose evidence favorable to the defense when that evidence is material either to guilt or to punishment."[20] "[T]here are three components to a *Brady* violation: the evidence at issue is favorable to the accused; the evidence was withheld by the state, either intentionally or inadvertently; and prejudice ensued, i.e., the evidence was material."[21] To raise a claim in an untimely and/or successive postconviction habeas petition, the petitioner has the burden of pleading and proving specific facts that demonstrate good cause and prejudice to overcome the procedural bars.[22] Good cause and prejudice parallel the second and third *Brady* components; in other words, proving that the State withheld the evidence generally establishes cause, and proving that the withheld evidence was material establishes prejudice.[23]

---

burglary could be committed at random and without apparent motive. For example, the inexplicable killing of one of several robbery or burglary victims might qualify as a murder committed "at random and without apparent motive."

[18]373 U.S. 83.

[19]*See Mazzan v. Warden*, 116 Nev. 48, 66, 993 P.2d 25, 36 (2000) (*Mazzan II*).

[20]*Id.*

[21]*Id.* at 67, 993 P.2d at 37.

[22]*See id.; see also* NRS 34.726(1); NRS 34.810(3).

[23]*See Mazzan II*, 116 Nev. at 66-67, 993 P.2d at 36-37.

If a defendant makes no request or only a general request for information, the evidence is material when a reasonable probability exists that the result would have been different had it been disclosed.[24] However, if the defense request is specific, the evidence is material upon the lesser showing that a reasonable possibility exists of a different result had there been disclosure.[25] In addition, in determining its materiality, the undisclosed evidence is considered collectively and not item by item.[26]

### A. Failure to disclose a jailhouse informant's statement, the accomplice's juvenile record, and information that a witness was a paid informant

We consider first the State's claim that the district court erred in concluding that the State had a duty, pursuant to *Brady*, to disclose the statement of Richard Perkins, a jailhouse informant. The State argues that Perkins' statement was not favorable to the defense and would not have changed the result. Bennett claims that the statement would have aided him during the penalty hearing to show that Beeson was the leader and instigator and, in turn, to persuade the jury to return a verdict less than death. We agree.

In 1988, Perkins was an inmate in the Clark County Detention Center along with Beeson. On October 3, 1988, after both the guilt and penalty phase of Bennett's trial had been completed, but before Bennett's formal sentencing, the LVMPD interviewed Perkins regarding information he had received from Beeson about the crimes at the Stop N' Go Market. According to Perkins, Beeson said that he and Bennett were on drugs; they went into the store with the intention to rob the clerk and had agreed to kill all witnesses in the store;[27] Bennett shot and killed the clerk; and Beeson shot the customer but did not kill him. According to Perkins, Beeson also admitted that he planned the murder of the people in the store and convinced Bennett to do the killing.

Under *Brady*, the first question is whether the evidence at issue is favorable to the defense. In regard to the guilt phase of the trial, Perkins' statement was not favorable to the defense because it indicated that Bennett killed the store clerk. However, in regard to the penalty phase, the statement was favorable to Bennett. It provided mitigating evidence characterizing Bennett as a follower with

---

[24]*See id.* at 66, 993 P.2d at 36.

[25]*See id.*

[26]*See id.* at 71, 993 P.2d at 39.

[27]The State should also have disclosed this evidence because it was relevant to refute the aggravating circumstance that the murder was random and without apparent motive.

Beeson planning and instigating the murder and convincing Bennett to participate.

The second question is whether the State withheld the evidence. The statement was made after the trial was concluded and the jury had rendered its verdict of death, but before Bennett was formally sentenced. If disclosed then, the fact of the statement would have provided grounds for a new penalty hearing.[28] In 1990, after Bennett filed his direct appeal, he specifically moved for discovery of statements made by an informant who, while in jail in 1988, received information from Beeson. The district court granted the discovery motion, but the State never produced Perkins' statement. If it had been disclosed when this request was made, the statement would have provided grounds for post-conviction habeas relief, as it does now.[29] The State, of course, has an affirmative duty to provide favorable evidence, if material, to a defendant even absent a request for the evidence.[30] Moreover, that duty exists regardless of whether the State uncovers the evidence before trial, during trial, or after the defendant has been convicted.[31]

Bennett only discovered Perkins' statement in 1999 when he conducted an investigation for his federal habeas petition. Therefore, the answer to the second question under *Brady* is affirmative: the State did withhold the evidence from the defense. And as explained above, the nondisclosure of the evidence also provides good cause for Bennett's raising this issue for the first time in his instant habeas petition.

The third question is whether the withheld evidence was material. Because Bennett made a specific request for this evidence, materiality is demonstrated if there is merely a reasonable possibility that the jury would not have returned a verdict of death had it been disclosed.[32] We conclude that this evidence was

---

[28]*See* NRS 176.515 (providing that a new trial may be granted based on the ground of newly discovered evidence).

[29]It is not clear why Bennett moved for discovery in the district court during the direct appeal or whether that court had the authority to grant the motion. But the operative fact is that Bennett communicated a specific request for *Brady* evidence to the State at that time, regardless of whether formal discovery in the district court was available.

[30]*See Lisle v. State,* 113 Nev. 540, 547, 937 P.2d 473, 478 (1997), *decision clarified on other grounds on denial of rehearing,* 114 Nev. 221, 954 P.2d 744 (1998); *People v. Gonzalez,* 800 P.2d 1159, 1206 (Cal. 1990).

[31]*See Imbler v. Pachtman,* 424 U.S. 409, 427 n.25 (1976) (stating that a prosecutor has the "duty to bring to the attention of the court or of proper officials all significant evidence suggestive of innocence or mitigation. At trial this duty is enforced by the requirements of due process, but after a conviction the prosecutor also is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction"); *accord Gonzalez,* 800 P.2d at 1206.

[32]*See Mazzan II,* 116 Nev. at 66, 993 P.2d at 36.

significant, and that there is not only a reasonable possibility, but there is also a reasonable probability of a different result if it had been disclosed, particularly when it is considered collectively with the other undisclosed evidence discussed below. Bennett argued in mitigation that he was young and had fallen under Beeson's influence and that Beeson had instigated the crimes. Absent Perkins' testimony, this claim rested mainly on Bennett's own self-serving statement in allocution which the jurors were apt to easily disregard as nothing more than an attempt to evade responsibility. Perkins' testimony as to Beeson's admission would have corroborated Bennett and shown that Beeson himself acknowledged that he had been the leader and Bennett the follower, lending Bennett much needed credibility. This evidence could have been crucial in the jury's decision-making process.

The State claims that Perkins' statement contains inadmissible hearsay and therefore cannot be material. Because the declarant, Beeson, is dead and Perkins gave an inconsistent statement in 1999 and no longer recalls some circumstances of Beeson's admissions, the State argues that the original statement lacks corroborating circumstances clearly indicating its trustworthiness. The State cites NRS 51.345(1), which requires such circumstances for the admission of a "statement tending to expose the declarant to criminal liability and offered to exculpate the accused in a criminal case." We are unpersuaded by this argument. First, evidence is generally admissible at a capital penalty hearing on any "matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible."[33] But more importantly, in attacking the statement's trustworthiness, the State relies on facts that did not exist in 1988 when the LVMPD obtained it and when the State should have provided it to Bennett. The State cannot now be heard to complain that since then Beeson has died and Perkins has partially contradicted his original statement and forgotten some facts. The State's failure in 1988 to disclose the statement deprived Bennett of an important opportunity now lost to him to question Perkins, and possibly Beeson's other fellow jail inmates, if not Beeson himself, regarding Beeson's admissions.

We therefore conclude that a reasonable probability exists that a jury would not have imposed a penalty of death had it been able to consider this evidence. This is particularly so when we consider that, as well, the jury relied upon an aggravator which was improper. Consequently, Bennett has also established the prejudice required to overcome procedural default.

---

[33]NRS 175.552(3); *see also, e.g., Leonard v. State,* 114 Nev. 1196, 1214, 969 P.2d 288, 299 (1998).

The State also violated *Brady* when it failed to disclose the prior criminal history contained in Beeson's juvenile records from Colorado, where he used the alias of Cass Goodman, and from Utah. This was mitigating evidence, favorable to the defense. Beeson's extensive juvenile records showed his criminal sophistication and lent credibility to Bennett's theory that Beeson acted as the leader in committing the crimes. This evidence was also material. As noted, undisclosed evidence is considered collectively and not item by item.[34] Had the jury learned of Beeson's juvenile record, as well as Perkins' statement, there is a reasonable probability that the jury would not have imposed death.

Finally, the State failed to disclose to the defense that the Utah police had paid a witness for the State, Jeffrey Chidester, $50 on each of four or five occasions for informant work. After the murder, Bennett returned to Utah where he admitted the murder and robbery to Chidester. Chidester relayed this information to the Utah police and testified at the guilt and penalty phases of Bennett's trial, but the jury was never told that Chidester had a history as a paid informant. After Bennett filed his federal habeas petition, he discovered that a Utah police detective, Jerry Caldwell, had paid Chidester for prior informant work.

The State argues that it lacked actual knowledge of the evidence, but " 'the state attorney is charged with constructive knowledge and possession of evidence withheld by other state agents, such as law enforcement officers.' "[35] In this case, a Utah police detective was aware of the evidence. We conclude that it is appropriate to charge the State with constructive knowledge of the evidence because the Utah police assisted in the investigation of this crime and initially supplied the information received from Chidester to the LVMPD. Moreover, Detective Caldwell, who knew of the payments to Chidester, testified at the guilt and penalty phases of the trial but denied that Chidester was paid.

That Chidester was paid small amounts is not material in regard to the jury's finding of guilt, and standing alone it would not be material in regard to the penalty phase. However, we have considered this evidence along with the other undisclosed evidence in concluding that the State withheld evidence material to the jurors' penalty determination. For example, the jury might have given less weight to Chidester's testimony regarding the

---

[34]*See Mazzan II,* 116 Nev. at 71, 993 P.2d at 39.

[35]*Jimenez v. State,* 112 Nev. 610, 620, 918 P.2d 687, 693 (1996) (quoting *Gorham v. State,* 597 So. 2d 782, 784 (Fla. 1992)); *see also Wade v. State,* 115 Nev. 290, 986 P.2d 438 (1999).

claimed "killing spree" if the jury had information supporting the inference that Chidester could have been tempted to give police exaggerated information in order to ingratiate himself to the police and obtain benefits, monetary or otherwise.

In sum, under *Brady* these three instances of undisclosed evidence were collectively material to Bennett's case in mitigation. Considering this undisclosed mitigating evidence in conjunction with the invalid aggravating circumstance, we conclude that the district court correctly vacated Bennett's death sentence and ordered a new penalty hearing.

### B. *The remaining* Brady *claims*

Bennett also claims that the State violated *Brady* with respect to other items of evidence, including: (1) Beeson's medical records, (2) Beeson's refusal to take a polygraph test, (3) the prosecutor's conversations with an eyewitness, (4) a crime lab report regarding gunpowder burns, and (5) a picture of a shoeprint. We conclude that the State did not violate *Brady* in these respects. Bennett either fails to show that the State had a duty to disclose the evidence or that he was prejudiced by the nondisclosure.

### 3. *Reweighing/harmless error*

"[T]he Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless error review . . . ."[36] In reweighing, this court disregards the invalid aggravating circumstances and reweighs the remaining permissible aggravating and mitigating circumstances.[37] A harmless error analysis involves performing a new sentencing calculus to determine whether the error of the invalid aggravating circumstance was harmless beyond a reasonable doubt.[38] Either analysis should produce the same result because both ask the same question: Is it clear that absent the erroneous aggravator the jury would have imposed death?[39]

As addressed above, the "at random and without apparent motive" aggravator is invalid. Remaining are three valid aggravators and three mitigating circumstances that the jury specifically found. The remaining aggravators are: Bennett knowingly created a great risk of death to more than one person; the murder was committed while Bennett was engaged in the commission of a burglary; and

---

[36]*Clemons v. Mississippi,* 494 U.S. 738, 741 (1990).

[37]*See State v. Haberstroh,* 119 Nev. 173, 183, 69 P.3d 676, 683 (2003).

[38]*See id.*

[39]*See id.* at 183, 69 P.3d at 682-83; *Leslie,* 118 Nev. at 783, 59 P.3d at 447.

the murder was committed while Bennett was engaged in the attempted commission of a robbery. The first aggravator is supported by sufficient evidence. The last two aggravators are also supported by sufficient evidence but are essentially based on the same aspect of this felony murder. The three mitigating circumstances are: no previous criminal history; Bennett's youth—eighteen at the time of the murder; and alcohol and drug usage. Also during the penalty hearing, the jury heard testimony that Bennett was led in the wrong direction by his fascination with heavy metal music and was influenced by Beeson as well as his other peers. Evidence also showed he had dyslexia and other problems in school, exhibited a potential for suicide, and showed signs of depression.

Considering the remaining aggravators, the mitigating evidence that the jury heard, and the undisclosed mitigating evidence that the jury did not hear, particularly the evidence regarding Beeson's dominant role in the crimes, we cannot conclude beyond a reasonable doubt that the jury would have imposed the death penalty in the absence of the erroneous aggravator and the State's *Brady* violations. For this reason, we affirm the district court's order vacating Bennett's sentence of death and ordering a new penalty hearing.

### 4. *Bennett's cross-appeal: other claims*

Bennett raises many other claims in his petition. Because Bennett's petition is untimely filed and successive, he must demonstrate good cause to excuse his procedural defaults and prejudice with respect to these claims, or he must show that failure to consider these claims will result in a fundamental miscarriage of justice. Although the district court stated in its order that Bennett's petition should be considered on the merits due to *Brady* violations, it failed to specifically address or expressly deny Bennett's additional claims. For our review, we assume that the district court denied those claims.[40]

Bennett's petition below improperly raised claims previously addressed and rejected on direct appeal. The doctrine of the law of the case prevents relitigation of these claims.[41] This doctrine cannot be avoided by a more detailed and precisely focused argument

---

[40]We note that a district court's failure to address and specifically resolve in its written judgment each and every claim presented in a petition can often present subsequent reviewing courts, both state and federal, with unintended difficulties. Pursuant to NRS 34.830(1) and NRAP 4(b)(2), judgments or orders of the district courts in post-conviction matters must contain "specific findings of fact and conclusions of law supporting the decision."

[41]*See Hall v. State,* 91 Nev. 314, 535 P.2d 797 (1975); *cf.* NRS 34.810(3).

upon reflection.[42] Bennett's claims in this respect are that the trial court improperly admitted Bennett's writings and music into evidence, the State improperly provided money and other inducements to a witness whose testimony was inherently incredible and prejudicial, the trial court improperly instructed the jury at sentencing, the death penalty as administered in Nevada does not satisfy constitutional standards, and the felony aggravators are unconstitutional. Bennett has failed to demonstrate that we should reconsider these issues.

Bennett's petition below also raised a number of claims that should have been raised on direct appeal. These claims are waived pursuant to NRS 34.810(3) because Bennett failed to demonstrate good cause and prejudice for failing to raise them earlier. These claims include that the aggravating circumstance that Bennett knowingly created a great risk of death to more than one person is invalid, that prosecutorial misconduct violated Bennett's right to a fair trial, that the prosecutor improperly delegated his charging discretion to the victim's family and police, that the district court erroneously failed to change the venue of the trial, that the jury instructions failed to properly delineate the elements of the capital offense and unconstitutionally minimized the State's burden of proof, that the jury instruction on reasonable doubt was unconstitutional, that the trial court failed to make a constitutionally reliable determination as to whether Bennett possessed the mental state of reckless indifference to human life necessary to impose a death sentence, that the trial court improperly admitted Beeson's writings into evidence, that the trial court improperly failed to remove jurors for cause and failed to prevent the removal of a juror for cause, that Bennett was deprived of an impartial trial tribunal, and that Bennett's conviction and sentence are invalid due to the inadequacy of the charging documents. Bennett also claims that this court's review on direct appeal and on appeal from his first petition for post-conviction relief was inadequate. We do not address these claims because Bennett has not demonstrated good cause and prejudice for failing to raise them earlier.[43]

Bennett claims that his counsel on direct appeal was ineffective for failing to raise the above-mentioned claims. Bennett should have raised this claim in his first post-conviction petition and has not demonstrated good cause or prejudice for his failure to do so.[44]

---

[42]*See Hall,* 91 Nev. at 316, 535 P.2d at 799.

[43]*See* NRS 34.810(3); NRAP 40(a).

[44]*See* NRS 34.810.

Bennett claims that the district court prevented him from investigating his claims in the first habeas proceeding when it granted his motion to hire an investigator but then denied his habeas petition the next day. Bennett claims that the district court's actions amounted to an impediment external to the defense and prejudiced him because an investigator would have discovered additional mitigating evidence, namely, Bennett's neuropsychological impairments, a head injury he sustained, physical and mental abuse he suffered as a child from his parents and siblings, his attention deficit hyperactivity disorder, a family history of alcoholism, explosiveness, violence, depression, and substance abuse, that Bennett once saved a life, and other medical and psychological records of Bennett's family and of Beeson. Bennett claims that had this mitigating evidence been presented to the jury he would not have received a death sentence. Because Bennett's first post-conviction counsel waited over three years before making a motion for funds to hire an investigator, we conclude that the district court did not create an impediment external to the defense that would excuse the procedural bars. Moreover, we express no opinion on the materiality of this evidence because Bennett will have an opportunity to present relevant mitigating evidence at the new penalty hearing.

Bennett claims that his first post-conviction counsel was ineffective for a multitude of reasons. Bennett was not statutorily entitled to post-conviction counsel at the time that he was convicted;[45] thus, he was not entitled to the effective assistance of post-conviction counsel.[46]

Bennett claims that he was denied his right to be present at critical stages of his trial proceedings in violation of *Gebers v. State*.[47] First, Bennett claims that after his trial, several hearings were conducted in his absence concerning the State's potential failure to disclose material exculpatory evidence. In support of this claim, Bennett cites to a transcript of a hearing conducted in Beeson's case. Bennett did not have a constitutional right to be present at his accomplice's trial proceedings after the cases were severed.

---

[45]*See* 1991 Nev. Stat., ch. 556, § 19, at 1754 (providing that "the court *may* appoint counsel" for an indigent petitioner (emphasis added)).

[46]*See McKague v. Warden,* 112 Nev. 159, 165 n.5, 912 P.2d 255, 258 n.5 (1996); *Crump v. Warden,* 113 Nev. 293, 303, 934 P.2d 247, 253 (1997); *see also Bejarano v. Warden,* 112 Nev. 1466, 1470 & n.1, 929 P.2d 922, 925 & n.1 (1996).

[47]118 Nev. 500, 50 P.3d 1092 (2002) (holding that it is a violation of the post-conviction habeas statutes to conduct an evidentiary hearing on the merits of a petition when the petitioner is not present).

Second, Bennett claims that he was not allowed to be present during post-conviction proceedings where evidence was taken by the district court on whether his petition was procedurally barred. Bennett cites to two 1994 hearings. At neither hearing did the district court receive any evidence regarding the claims in Bennett's petition; thus, no *Gebers* violation occurred. Next, Bennett cites to the district court's written order dismissing his first petition in 1994. Again, Bennett fails to demonstrate that a *Gebers* violation occurred.

Last, Bennett claims that this court has not applied its procedural bars consistently and that applying the bars to him would violate his equal protection and due process rights. Bennett did not make this argument in his opening brief, and the State did not raise the issue in its answering brief. Bennett is therefore barred from raising this claim in his reply brief, pursuant to NRAP 28(c), which requires reply briefs to be limited to new matters in the answering brief. Consequently, we will not consider this claim.[48]

## CONCLUSION

We conclude that the finding of the "at random and without apparent motive" aggravator was erroneous in this case. When considered in combination with the State's *Brady* violations, particularly the State's failure to disclose evidence that Bennett's accomplice played a dominant role in the crimes, we are unable to conclude beyond a reasonable doubt that the jury would have returned a verdict of death in the absence of these errors. We therefore affirm the district court's order vacating Bennett's sentence of death and ordering a new penalty hearing.[49]

ROSE, LEAVITT and MAUPIN, JJ., concur.

GIBBONS, J., concurring in part and dissenting in part:

I concur that the majority's decision may be appropriate based upon the holding of this court in *Leslie v. Warden*.[1] However, I respectfully dissent from the majority's conclusion that we should address the merits of this case and affirm the district court's grant of a new penalty hearing. It is undisputed that the petition before the court is successive, raising the same grounds as the prior petition.[2] It is undisputed that the petition before the court comes

---

[48]We note, however, that the claim appears to be without merit. *See Pellegrini,* 117 Nev. 860, 34 P.3d 519.

[49]THE HONORABLE MIRIAM SHEARING, Justice, did not participate in the decision of this matter.

[1]118 Nev. 773, 59 P.3d 440 (2002).

[2]NRS 34.810(2).

*eight years* after the statutory deadline set by the Legislature elapsed.[3] It is undisputed that "[o]ur determinations on direct appeal are the law of the case."[4]

Despite these undisputed procedural bars, the majority desires to address the merits of this appeal. I dissent as to those conclusions as well. Substantial evidence supported the "at random and without apparent motive" aggravator and the jury's finding of a murder independent from the robbery.[5] Bennett intended to go on a killing spree in addition to a robbery spree.[6] His actions were premeditated and atypical of murders incidental to robbery. Thus, I would reinstate the death penalty.

*Successive petitions*

NRS 34.810(2) requires dismissal of a petition that "fails to allege new or different grounds for relief." An exception to dismissal applies only if the district court determines good cause and actual prejudice exist.[7]

"To show 'good cause,' a petitioner must demonstrate that an impediment external to the defense prevented him from raising his claims earlier."[8] A petitioner must show "that the factual or legal basis for a claim was not reasonably available . . . or that 'some interference by officials' made compliance impracticable."[9]

Bennett claims that the State's numerous *Brady v. Maryland*[10] violations, combined with ineffective assistance of post-conviction counsel, demonstrate good cause for excusing the procedural defects. I disagree with the majority that the State violated *Brady.* Although the district court may have failed to allow Bennett's first post-conviction counsel proper time to investigate, I do not consider the failure an "impediment external to the defense."[11] Bennett's counsel delayed *three years* before filing a supplemental

---

[3]NRS 34.726.

[4]*Leslie,* 118 Nev. at 784, 59 P.3d at 447-48.

[5]*See* NRS 200.033(9).

[6]The poetry seized at Bennett's home included the following: " 'My thirst for blood is now calm, but it shall rise again. My power is so strong I need to cause some death. I'm so [expletive omitted] powerful and my reigning just begun as I kill and kill again. Death is rising from the air as the thunderbolts strike. Blood is dripping from the wall. Someone gonna, someone's gonna die.' " *Bennett v. State,* 106 Nev. 135, 138 n.1, 787 P.2d 797, 799 n.1 (1990).

[7]NRS 34.810(3).

[8]*Pellegrini v. State,* 117 Nev. 860, 886, 34 P.3d 519, 537 (2001).

[9]*Murray v. Carrier,* 477 U.S. 478, 488 (1986) (quoting *Brown v. Allen,* 344 U.S. 443, 486 (1953)) (internal citation omitted), *quoted in Harris v. Warden,* 114 Nev. 956, 960 n.4, 964 P.2d 785, 787 n.4 (1998).

[10]373 U.S. 83 (1963).

[11]*Pellegrini,* 117 Nev. at 886, 34 P.3d at 537.

petition. Despite filing the supplemental petition, Bennett's counsel did not request an investigator until several months later.

Brady *violations*

"[T]here are three components to a *Brady* violation: the evidence at issue is favorable to the accused; the evidence was withheld by the state, either intentionally or inadvertently; and prejudice ensued, i.e., the evidence was material."[12] A petitioner raising a *Brady* claim in a successive post-conviction petition must prove good cause and prejudice to overcome the procedural bars.[13]

Bennett raised eight pieces of evidence the State allegedly withheld. However, he presented specific evidence of the State's withholding on only four pieces. Of those, only two pieces of evidence had potential to assist Bennett at his sentencing hearing. Neither of these pieces of evidence, Richard Perkins' statement and the payment to Jeffrey Chidester, would have changed the outcome of the penalty hearing. Bennett's failure to demonstrate how this evidence would have changed the result of the penalty hearing makes his assertion of *Brady* violations meritless.

Leslie v. Warden[14]

The majority affirms the grant of a new penalty hearing for Bennett in part because of the conclusion in *Leslie* that the " 'at random and without apparent motive' aggravator is misapplied to situations where the defendant unnecessarily kills another person in the course of a robbery."[15] I disagree with the contention that the facts of this case are so analogous to *Leslie* that the result must also be the same.

This court concluded in *Leslie* that to use the "at random and without apparent motive" aggravator, the State must demonstrate that "the defendant selected his victim without a specific purpose or objective and his reasons for the killing are not obvious or easily understood."[16] It is insufficient to merely show the defendant unnecessarily murdered someone during a robbery.[17]

Despite a jury's finding to the contrary, the court in *Leslie* held that insufficient evidence existed to support the "at random and without apparent motive" aggravator.[18] Instead, the *Leslie* major-

---

[12]*Mazzan v. Warden,* 116 Nev. 48, 67, 993 P.2d 25, 37 (2000).

[13]*Id.; see also* NRS 34.726(1); NRS 34.810(3).

[14]118 Nev. 773, 59 P.3d 440 (2002) (4-3 decision).

[15]*Id.* at 781, 59 P.3d at 446.

[16]*Id.* at 782, 59 P.3d at 446.

[17]*Id.* at 781-82, 59 P.3d at 446.

[18]*Id.* at 782, 59 P.3d at 446.

ity discerned that Leslie had motives that were not even mentioned at trial.[19]

I prefer the reasoning of the dissent in *Leslie*.[20] The *Leslie* dissent reviewed the decision from the direct appeal that " '[e]vidence indicated that Leslie had received the money and could have left the store unfettered, but killed [the clerk] anyway.' "[21] The *Leslie* dissent concluded that "[n]othing has changed to warrant overturning that conclusion. If the Legislature's intent were as clear as the majority suggests, it could have amended the statute to invalidate the use of the at-random aggravator in robbery situations."[22]

Here, Bennett's poetry indicates his " 'need to cause some death.' "[23] He also told a friend about the " 'killing spree' " he and Joe Beeson were on.[24] Bennett was convicted of murdering Michelle Moore "without a specific purpose or objective and his reasons for the killing are not obvious or easily understood."[25] Without any communication, Bennett simply pulled out a .45 caliber handgun and shot Michelle Moore in the face. I cannot find a reason for this murder that is "obvious or easily understood."[26]

Perhaps more importantly, the *Leslie* dissent recognized the lack of authority to expand the "fundamental miscarriage of justice" standard to encompass invalidation of aggravators.[27] "We have recognized only two situations which meet this standard, where a petitioner makes a colorable showing that he is actually either innocent or ineligible for the death penalty."[28]

The jury found four aggravating circumstances. Assuming, arguendo, that we eliminated the "at random and without apparent motive" aggravator, three valid aggravating circumstances remain. Thus, as the *Leslie* dissent concluded, "no fundamental miscarriage of justice exists which would permit this court to disregard procedural bars required by statute."[29]

---

[19]*See id.*

[20]Justice Shearing authored the dissent, with then-Chief Justice Young and Justice Agosti concurring.

[21]*Id.* (SHEARING, J., dissenting) (quoting *Leslie v. State,* 114 Nev. 8, 22, 952 P.2d 966, 976 (1998)).

[22]*Id.* (SHEARING, J., dissenting).

[23]*Bennett v. State,* 106 Nev. 135, 138 n.1, 787 P.2d 797, 799 n.1 (1990).

[24]*Id.* at 138, 787 P.2d at 798.

[25]*Leslie,* 118 Nev. at 782, 59 P.3d at 446.

[26]*Id.*

[27]*Id.* at 786-87, 59 P.3d at 449 (SHEARING, J., dissenting).

[28]*Id.* (SHEARING, J., dissenting).

[29]*Id.* at 787, 59 P.3d at 449 (SHEARING, J., dissenting).

*Law of the case*

The majority affirms the grant of a new penalty hearing based upon *Leslie.* Ironically, the issues Bennett raises in his petition are identical to the ones rejected on direct appeal. In *Leslie,* we stated that ''[o]ur determinations on direct appeal are the law of the case.''[30] ''The doctrine of the law of the case cannot be avoided by a more detailed and precisely focused argument subsequently made after reflection upon the previous proceedings.''[31]

Bennett first filed a petition for post-conviction relief in 1990, alleging ineffective assistance of counsel. After the district court appointed counsel for Bennett, no further activity relative to this petition occurred for more than three years. In 1993, Bennett filed a new petition alleging ineffective assistance of counsel and cumulative and prejudicial error. This new petition was allegedly a supplement to the first petition.

The district court properly dismissed the new petition. We then allowed review of the merits, despite agreeing with the State that the petition was procedurally barred, and affirmed the district court's dismissal.[32] The majority concludes that *Leslie* applies here and that the procedural bars do not. I dissent from that conclusion.

BECKER, J., dissenting:

I respectfully dissent from the majority's conclusion that Bennett's second petition for post-conviction relief was not successive and procedurally barred. Moreover, while I agree with the majority's conclusion that Bennett is factually innocent of the ''at random and without apparent motive'' aggravator pursuant to *Leslie v. Warden,*[1] Bennett has not met the second prong of *Leslie.* In addition to demonstrating that the aggravator is inapplicable, *Leslie* requires a finding that there is a reasonable probability that, absent the invalid aggravator, the jury would not have imposed death.[2] I do not believe that the absence of the ''at random and without apparent motive'' aggravator would have affected the jury's decision to impose a sentence of death. Because I conclude that the petition is procedurally barred and does not fall within the parameters of *Leslie,* I would reverse the judgment of the district court and reinstate the death penalty.

Brady *violations*

I concur with the majority's conclusion that the State failed to disclose the 1988 signed statement of informant Perkins and that

---

[30]*Id.* at 784, 59 P.3d at 447-48.

[31]*Hall v. State,* 91 Nev. 314, 316, 535 P.2d 797, 799 (1975).

[32]*Bennett v. State,* 111 Nev. 1099, 1103, 901 P.2d 676, 679 (1995).

[1]118 Nev. 773, 59 P.3d 440 (2002).

[2]*Id.* at 780, 59 P.3d at 445.

the State can be charged with failing to disclose that the Utah police paid Jeffery Chidester $50 as an informant on four or five occasions that were unrelated to the Nevada crimes. However, I disagree with the conclusion that the State violated *Brady v. Maryland*[3] by not disclosing the co-defendant's juvenile records.

As to the Perkins statement, the issue is whether there is a reasonable possibility that Bennett would have been granted a new penalty hearing on the basis of the statement because a specific request for information was made under *Brady*. As to the informant payments, no specific discovery request was made, so the standard is whether there is a reasonable probability that a new penalty hearing would have been granted.

I conclude that a request for a new penalty hearing based on newly discovered evidence is identical to the standard used for analyzing a motion to grant a new trial based upon newly discovered evidence. In *Sanborn v. State*,[4] we set forth the standard for granting a new trial based upon newly discovered evidence. The evidence must be:

> [N]ewly discovered; material to the defense; such that even with the exercise of reasonable diligence it could not have been discovered and produced for trial; non-cumulative; such as to render a different result probable upon retrial; not only an attempt to contradict, impeach, or discredit a former witness, unless the witness is so important that a different result would be reasonably probable; and the best evidence the case admits.[5]

Even assuming that the Perkins statement meets all of the other criteria, it is cumulative, and I conclude that there is not a reasonable possibility that a new penalty hearing would have been granted as a result of its discovery. As to the informant payments, that evidence would have been used for impeachment or to discredit a witness. In light of the fact that the jury already heard that Chidester was an informant and was paid $32,000 in reward money, I cannot conclude that a different result would be reasonably probable and a new trial granted if the jury also learned he was paid approximately $250 as an informant in the past. This is particularly true in light of the fact that Chidester's information regarding the crime and the location of the murder weapon was corroborated by Bennett's fingerprints at the scene of the crime and the identification of Bennett as the individual who returned the murder weapon to a pawn shop after the murder. The same rationale applies to use of the information to impeach Officer Caldwell. For these reasons, I conclude that a new penalty hearing

---

[3]373 U.S. 83 (1963).

[4]107 Nev. 399, 812 P.2d 1279 (1991).

[5]*Id.* at 406, 812 P.2d at 1284-85 (footnote omitted).

would not have been granted and materiality was not shown under *Brady.*

*Fundamental miscarriage of justice—*Leslie

This case is distinguishable from *Leslie.* In *Leslie,* there was no evidence that the defendant entered the convenience store with the intent to shoot anyone. Moreover, although Leslie shot and killed the clerk, he made no attempt to kill any of the other occupants and witnesses to the robbery. Finally, unlike the instant case, this court, either on direct appeal or on post-conviction relief, struck two of the four aggravators.

In contrast, Bennett is only factually innocent of one of the four aggravators. The remaining aggravators, including that he endangered more than one person, remain valid. The evidence supporting the stricken aggravator would also be admissible to support the other three aggravators. Thus, in weighing mitigating versus aggravating circumstances, the jury would still have heard evidence that Bennett and the co-defendant planned to commit robberies because they were running low on funds and that they intended to kill any witnesses. They would still have been able to consider the fact that Bennett and the co-defendant chased after a witness in the attempt to eliminate him. Since the essential evidence remains the same, I cannot conclude that there is a reasonable probability that the jury, with the same aggravating and mitigating evidence, would not have imposed death simply because the "at random and without apparent motive" aggravator was stricken.

Accordingly, for the reasons set forth above, I would reverse the judgment of the district court and reinstate the death penalty.